Amy NICHOLS Plaintiff,

v.

**WAL–MART STORES, INC. ASSOCIATES' HEALTH AND WELFARE PLAN; and Administrative Committee of Wal–Mart Stores, Inc. Associates Health and Welfare Plan Defendants.**

No. 2:00–CV–00010 PGC.

United States District Court,
D. Utah,
Central Division.

Feb. 26, 2003.

Order Altering Judgment in
Part, March 26, 2003.

Marcie E. Schaap, Nicole T. Durrant, King Burke & Schaap, Brian S King, Mr., Salt Lake City, for Amy Nichols, plaintiff.

W. Waldan Lloyd, Mr., Callister Nebeker & McCullough, Christopher G. Jessop, Corbridge Baird & Christensen, Salt Lake City, Michael T. Graham, Peter R. Bulmer, Jackson Lewis Schnitzler & Krupman, Chicago, IL, Thomas H. Lawrence, Jennifer Ann Harris, Lawrence & Russell LLP, Memphis, TN, for Wal–Mart Stores, Inc., Associates' Health and Welfare Plan, Administrative Committee of Wal–Mart Stores, Inc. Associates Health and Welfare Plan, defendants.

## MEMORANDUM OPINION AND ORDER GRANTING PARTIAL SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS

CASSELL, District Judge.

This matter is before the court on cross-motions for summary judgment. The essence of the dispute is over whether the plaintiff, Amy Nichols, was entitled to insurance coverage under defendant Wal–Mart's Health and Welfare plan for procedures that occurred at the end of her pregnancy. The court held a hearing on this matter and requested supplemental briefing from the parties. Being fully advised, the court grants partial summary judgment for Ms. Nichols and remands for further proceedings.

## FACTUAL BACKGROUND

Amy Nichols was a beneficiary of the Wal–Mart Associates' Health and Welfare Plan (the "Plan") and eligible for benefits under the Plan. Ms. Nichols's husband Tory was a Wal–Mart employee in May of 1995. The Plan is a group medical benefits plan sponsored by Wal–Mart Stores, Inc., for the benefit of its employees and their dependents. The Plan is self-funded, and the Administrative Committee of the Plan (the "Committee") was the plan administrator. The Committee was the named fiduciary of the Plan. Wal–Mart Stores, Inc. sponsors the Plan, and pays the plan administrator.

### Medical History

In mid-December 1994, Ms. Nichols became pregnant. At 17½ weeks, Dr. Geral Mortimer (Ms. Nichols's obstetrician) performed an ultrasound that demonstrated poor visualization of the fetus such that the fetal sex could not be determined.

On May 17, 1995, Dr. Mortimer performed another ultrasound which caused him concern because of ogliohydramnios. Ogliohydramnios is a deficiency of amniotic fluid sometimes resulting in an embryonic defect through adherence between embryo and amnion. Dr. Mortimer referred Ms. Nichols to the University of Utah Medical Center (UUMC), in Salt Lake City, for additional testing.

On May 19, 1995, Ms. Nichols had an abnormal obstetrical sonogram at UUMC which showed that the fetal size was equivalent to 22.7 weeks. Multiple cysts were seen on both fetal kidneys. No definite fetal bladder of amniotic fluid was seen. The fetus had bilateral mulitcystic [polycystic] dysplastic kidneys indicating abnormal growth or development of the kidneys. Plycystic kidney disease can be either one of two hereditary diseases characterized by gradual enlarging bilateral cysts of the kidney which lead to reduced renal function. It is a disease that is inherited as an autosomal recessive trait. It usually affects infants or children and results in renal failure. Ms. Nichols was not admitted to the UUMC at this time. Instead, she returned home.

On May 24, 1995, at approximately 23½ weeks into her pregnancy, Ms. Nichols was admitted to UUMC and treated for complications in her pregnancy. Ms. Nichols' diagnosis upon admission was for fatal fetal anomalies, premature rupture of membranes, and breech presentation. An amniotic infusion was attempted at UUMC, but this attempt failed. The fetus had "grave and fatal fetal anomalies" and was non-viable. Ms. Nichols consulting with her husband and her physician. She also consulted her uncle—Dean of the University of Florida College of Medicine—as to the best course of action for Ms. Nichols and her baby. Her uncle confirmed the lethality of the condition to both mother and baby. Based on these consultations, the decision was made to induce labor due to grave fetal anomalies.

At 2:53 a.m. on May 25, 1995, Matthew Lynn Nichols was born still born. He weighed 700 grams and had Apgar scores of zero, one minute after birth, and zero, five minutes after birth. There were no contractions or fetal heart monitoring. An autopsy was performed and the cause of Matthew's death was determined to be intrauterine fetal demise, fatal fetal polycystic dysplastic kidneys, and bilateral severe ogliohydramnios.

### Plan Language

The Plan specified generally what procedures it would cover and those it would not. Specifically, the plan stated:

#### Pregnancy

The benefit for expenses due to pregnancy, including birthing centers, licensed doctors, nurses, or midwives operating under state guidelines, is eligible

for payment the same as for any other illness, after the services are performed.

*Hospital Expenses -*

For each hospital confinement, whether inpatient or outpatient, your Medical coverage will pay for the following eligible hospital expenses for the described limits:

Room and Board—Charge for room and board will be allowed at the prevailing semi-private room rate. In the event the institution has only private rooms, 90% of the hospital's lowest private room rate for the hospital will be covered.

Intensive Care, Cardiac Care, and Other Critical Care

Other Hospital Services—Expenses incurred for services and supplies furnished by the hospital for medical care such as operating room, x-ray, laboratory tests, medicines, etc., administration of anesthetics, and local ambulance service.

*Other Covered Expenses*

Doctors' Services

*Charges Not Covered*

Benefits shall not be payable for treatment or services for the following:

Charges for, or relating to, any treatment or service for abortions, sexual dysfunction, infertility, birth control, sex transformations, sterilization or reversal of sterilization procedures, artificial inseminations, in-vitro fertilizations or embryo transfers, and any complications arising therefrom (whether or not a doctor indicates medical necessity).

. . .

Charges for routine ultrasounds for pregnancy.

. . .

Charges for elective (non-emergency), (non-urgent) hospital confinements outside the United States without prior approval.

The Plan further outlined the plan participant's rights under the Employee Retirement Income Security Act of 1974 (ERISA). It stated:

. . . plan participants shall be entitled to:

1. Examine, without charge, at the Plan Administrator's office, all plan documents including insurance contracts, collective bargaining agreements and copies of all documents filed by the plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions.

2. Obtain copies of all plan documents and other plan information upon written request to the Plan Administrator. The Plan Administrator may make a reasonable charge for the copies.

*Claims Process*

On May 25, 1995, Marj Brown, an employee of UUMC, spoke to Jamie Pendergraft, an employee of the Plan to obtain insurance benefit verification for Ms. Nichols. Ms. Pendergraft indicated that UUMC was a network facility. She further stated that there was a $250 policy deductible, a $150 hospital admission deductible, and that the claims would be payable at an 80% co-insurance rate (with an out of pocket maximum of $1250).

On June 6, 1995, UUMC billed the Plan for expenses incurred in Ms. Nichols's treatment. The Plan did not pay for the May 17, 1995 ultrasounds. They did pay for other expenses related to these events, including the anesthesiology for the procedure. The Plan paid neither the $1,100 claim from the UUMC obstetrics department, the $4069.88 claim for fetal abnormalities, nor claim for the delivery with the diagnosis of "ogliohydramnios." The Plan took the position that the procedure

was "elective surgery" and that abortions were not covered.

### Administrative Appeal

On June 22, 1995, UUMC personnel called the Plan to follow up on pending claims for treatment. The Plan indicated they had not received any hospital claims. On July 20, 1995, UUMC again followed up on the claims, and Barbara with the Plan indicated she needed additional information from Ms. Nichols.

On August 8, 1995, UUMC personnel again called to follow up on the pending claims, they were put on hold for five minutes and eventually hung up.

On September 27, 1995 UUMC again called the Plan to follow up on the pending claims. Barbara McCarty from Wal–Mart indicated they would deny Ms. Nichols's claims because the condition was *preexisting*.

On January 9, 1996, UUMC again called the Plan and spoke with Janie Allmendinger. Ms. Allmendinger indicated that no payment would be forthcoming if there was a *fetal heartbeat* prior to delivery.

On June 17, 1996, Amy Nichols' husband, Tory Nichols, called the Plan again to follow up on the claims. He was told there would be no payment if there was a fetal heartbeat before delivery.

On June 27, 1996, UUMC called the Plan again to determine the status of claims. Linda Tunnell from the Plan indicated the claim had been denied because the pregnancy termination was *elective surgery*. She said that someone had put in the wrong procedure code. She apologized and indicated it would take three to four weeks to process the claim.

On October 21, 1997, UUMC called the Plan again and spoke to Isabel Estrada. She indicated she would pull the file and call the next day.

On October 22, 1997, UUMC called the Plan again and spoke to Jennifer Hurless.

Ms. Hurless agreed to send the explanation of benefits to the Hospital.

On October 23, 1997, UUMC again called the Plan and spoke with Brandie Van Sickle. Ms. Van Sickle indicated she had sent the claim over for reconsideration but it was never received. She said she would do a "hot claim" to expedite matters.

On October 27, 1997, UUMC called the Plan and spoke with Lynn Vanhook. Ms. Vanhook indicated the claim would not be reprocessed. It would remain denied for *elective surgery*. She confirmed as long as the baby had a *heartbeat*, it would be considered an elective abortion.

On January 28,1998 Claims Management, Inc. ("CMI"), a Utah corporation assisting families and health care providers in obtaining review of denied claims and assisting with the administrative appeal of denied claims, wrote to the Appeals Department requesting an appeal of the denied claims for the UUMC services. CMI explained that the primary diagnosis for Ms. Nichols, pursuant to the Current Procedural Terminology ("CPT") was:

1. Fetal abnormality affecting the management of the mother

2. premature rupture of the membranes

3. breech presentation.

CMI requested that, if the Plan maintained its denial, it send a copy of its reasons for denial. CMI enclosed a copy of authorization signed by UUMC.

On February 17, 1998, Terri Harral, Appeals Coordinator for Wal–Mart Claims Administration sent a letter to CMI indicating that only the participant could appeal a denial of benefits and denied CMI's request for an appeal. The plan indicated that the requested documents would not be provided without a subpoena.

## Prior Litigation

On May 21, 1998, UUMC filed a small claims action for the payment of benefits due for $2935.90. On July 22, 1998, the Plan removed the small claims case to Federal court as case # 2:98–CV–00552–C. On July 22, 1999, Judge Tena Campbell dismissed the case and remanded it to the plan administrator for further administrative appeal. Judge Campbell concluded that the Nichols had not fully exhausted their administrative remedies.

On July 29, 1999, the law firm of King & Schaap, representing Ms. Nichols, sent a letter to the Plan further appealing the claim denial for Ms. Nichols's treatment at UUMC. On August 18, 1999, Andrea Lawrence, a representative of the Plan, responded maintaining the denial of claims based on the exclusion for abortions contained in the *1996* Plan. Ms. Nichols's treatment was in 1995.

On September 14, 1999, counsel for Ms. Nichols sent a letter to Ms. Lawrence requesting fifteen very specific pieces of information from the Plan. The information concerned the definition of abortions and elective surgery and the like. On October 8, 1999, the Committee responded by indicating the claims would be reconsidered at the Committee's November 8, 1999 meeting.

On November 8,1999, the Committee discussed the September 14, 1999, letter it received from Ms. Nichols' counsel. The Committee acknowledged the possibility a physician should review the claims.

On November 22, 1999, the Committee again considered Ms. Nichols' claim. The administrative record contains neither a summary of that meeting nor any indication of what was discussed. The next day, on November 23, 1999, the Committee sent a letter to Ms. Nichols' counsel maintaining denial of the benefits based on the *exclusion for abortions* contained in the 1995 plan.

On December 14, 1999, Ms. Nichols' counsel sent another letter to the Committee asking why it had not responded to the fifteen questions posed in the September 14, 1999 letter. On December 21, 1999 Michael Graham, counsel for the Plan, asserted that the Committee had no obligations to respond to the questions.

## Current Litigation

On January 6, 2000, Ms. Nichols filed this lawsuit seeking payment of the outstanding medical bills related to her pregnancy termination. The Plan answered and, on October 3, 2001, filed a motion to affirm the Committee's decision.

On December 4, 2001, Judge Alba ordered the Plan to respond to the fifteen questions posed by Ms. Nichols. On December 11, 2001, the Plan lodged a timely objection to Judge Alba's ruling. On May 2, 2002, Judge Stewart reversed Judge Alba's order but allowed restricted discovery on the issue of any conflict of interest of members of the Committee.

On July 9, 2002, this case was transferred to the undersigned judge as part of the initial allocation of cases to a new judge.

By stipulation, the parties agreed that responses to Ms. Nichols' discovery requests were due by July 10, 2002. On July 10, 2002, the Plan responded to Ms. Nichols' interrogatories and requests for production of documents, but not her requests for Admission.

On July 12, 2002, Ms. Schaap deposed Kris Howard, Director of Benefits for Wal–Mart Stores. During the deposition the attorney for the Plan refused to allow Ms. Howard to answer questions regarding her ownership of Wal–Mart stock.

On August 13, 2002, Ms. Schaap sent the Plan a letter asking for additional information they did not have available at the deposition—specifically the names of the

Committee members who considered Ms. Nichols's claim and the disclosure of each individuals' financial interest in Wal–Mart Stores, Inc. On August 14, 2002, the Plan responded stating they would not provide this information.

## DISCUSSION

Ms. Nichols brought this action under Employee Retirement Income Security Program ("ERISA"), 29 U.S.C. § 1001 et seq. This Court has jurisdiction over the complaint under 29 U.S.C. § 1132(e)(1). Ms. Nichols complaint seeks recovery of benefit plans under 29 U.S.C. § 1132(a)(1)(B); alleges breach of 29 U.S.C. § 1133 for failing to provide plaintiff with a "full and fair review"; and of 29 U.S.C. § 1022 for failure to include in the Plan certain language in the summary description of plan benefits. Ms. Nichols also seeks associated recovery of costs, damages, and attorneys fees under 29 U.S.C. § 1031, 1024, and 1132(c)(1).

### Full and Fair Review

■ Though the parties have argued several issues in their motions for summary judgment, this court's resolution turns solely on the question of full and fair review. Congress has directed that a plan must follow certain procedural safeguards when denying benefits to a plan participant. As the Tenth Circuit has summarized these steps:

First, the plan must provide the participant with written notice of the denial which sets for the specific reasons underlying the decision. Second, the plan must afford a reasonable opportunity for a full and fair review by the appropriate named fiduciary of the decision denying the claim.... [T]he review procedure must permit the claims to (i) request a review upon written application to the plan; (ii) review pertinent documents; and (iii) submit issues and comments in writing.[1]

In its decision in *Sandoval v. Aetna Life and Casualty Insurance Co.,* the Tenth Circuit explained that a full and fair review requires:

"knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision."[2]

In *Sandoval,* the Tenth Circuit affirmed a District Court ruling affirming a denial of benefits.[3] In that case, the Circuit noted that counsel for the plaintiff failed to present any additional evidence to the Administrator, after repeated invitations to do so. Furthermore, the plaintiff did not submit any additional relevant evidence to the committee for purposes of its review.[4] In light of the plaintiff's choice not to participate fully in the review process, the denial of benefits was appropriate.[5]

■ In this case, Wal–Mart argues, not surprisingly, that the same result as *Sandoval* is appropriate—that is, affirmance of the plan administrator's decision. But this case stands in a vastly different posture. In fact, it is clear under *Sandoval* that reversal is appropriate. In contrast to the

---

1. *Sandoval v. Aetna Life and Cas. Ins. Co.,* 967 F.2d 377, 381 (10th Cir.1992) (internal quotations and citations omitted).

2. *Sandoval,* 967 F.2d 377, 382, *citing Sage v. Automation, Inc. Pension Plan & Trust,* 845 F.2d 885, 893–94 (10th Cir.1988), *quoting Grossmuller v. International Union, United Auto., Aerospace & Agr. Implement Workers of America, UAW, Local 813,* 715 F.2d 853, 858 n. 5 (3rd Cir.1983) (*emphasis added*).

3. 967 F.2d at 381.

4. 967 F.2d at 381.

5. *Id.*

plaintiff in *Sandoval,* Ms. Nichols repeatedly asked the Committee to look at additional evidence. For example, Ms. Nichols repeatedly asked for Wal–Mart to discuss this matter with Tory Nichols' uncle, Chief of Obstetrics at the University of Florida, who was consulted in this case. So far as the court can determine from reviewing the record before it, Wal–Mart did not do so. Furthermore, it appears that Wal–Mart may have ignored the evidence it did have before it. The administrative record filed with this court indicates that the Committee only looked at Ms. Nichols medical records, which never once describe Ms. Nichols' pregnancy termination as a "elective abortion." In fact, the medical records specifically define the procedure as "fetal abnormalities affecting the management of the mother," or "fetal abnormalities," or "ogliohydramnios." [6] Finally, the Plan even ignored its own instincts to have an outside physician review the claim, as is frequently done in complicated cases.[7]

After three years of persistence by Ms. Nichols to resolve this matter with the Plan, *the Plan* chose to label what happened to Ms. Nichols an "elective abortion." When the Nichols sought further explanation of the denial of benefits, they received a series of unilluminating "form letters" from Wal–Mart. In response to Ms. Nichols' request for a specific explanation of their denial of benefits, an attorney responded with little more than unspecific and generic "legalese." The Plan's brief letter cited an unpublished district court opinion from the Southern District of Illinois that concluded elective abortions were not covered under the Plan, without explaining how that situation was analogous

to Ms. Nichols' situation.[8] The letter further stated Wal–Mart had no obligation to answer the questions posed to them by Ms. Nichols' counsel. Finally, the letter merely recited the procedural requirements of *Sandoval* [9] without any explanation of how the Plan had met or planned to meet these requirements in Ms. Nichols' case.

Perhaps the plan administrator undertook a more thorough review of the claim than is revealed in the terse letter from counsel. But with the record before it, the court has no evidence supporting Wal–Mart's denial, producing a clear violation of 29 U.S.C. § 1133(1), which requires the plan to set forth the *specific reasons* underlying their decision. When asked about these deficiencies in the record at the hearing on this matter, counsel for the Plan essentially argued that, because the decision to deny benefits was correct on the merits, the court should conclude that the review of the claim was full and fair. While counsel's candor is commendable, the court cannot proceed in this fashion. It is not for the court to determine, in the first instance, whether a denial is appropriate. That is for the plan administrator. The court's task is to make sure that a review of a claim is full and fair. On this record, the court has little more than a "black box" in front of it—a Committee that has denied benefits without any clear articulation of the reasons behind that denial. ERISA demands that the Plan be more forthcoming.

Indeed, were the court to venture into the issue of the correctness of the denial, it is not immediately clear that the decision is correct. The Plan must act in a consis-

---

6. CPT Code 65581.

7. *See Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1098 (10th Cir.1999); *Sandoval* 967 F.2d at 382; *Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 827 (10th Cir.1996).

8. Case No. 98–CV 4301 (S.D.Ill. July 21, 1999).

9. *See* 967 F.2d 377.

tent manner.[10] An administrator's interpretation of a plan must be "consistent with goals of the plan" and "applied consistently." [11] Here—almost incomprehensibly—the Plan authorized payment of the anesthesiologist that provided anesthesia to Ms. Nichols during the procedure but denied payment for the underlying procedure itself. At oral argument, counsel for the Plan candidly admitted that he saw little sense for the different treatment. He gamely tried to argue that the anesthesiologist was properly paid as "preparation" for the procedure at issue, while the procedure itself involved a different professional. That kind of fine distinction would make the medievalists who counted angles on pinheads proud.

In sum, the court has little more than the Plan's "trust us" representations that a full and fair review took place. Congress mandates more—the court must insure that the Plan has fulfilled its obligations to "consider the evidence presented by both parties." [12] While Congress did not intend ERISA reviews to be costly hearings,[13] Congress did intend them to be fair to provide answers to plan participants regarding their claims. So far as the court can determine in this case, the Plan chose to ignore relevant medical evidence, ignore the evidence in the records before it, and to decline to clearly explain its denial of benefits to Ms. Nichols. As a result, this court must remand this matter back to the Committee to provide Ms. Nichols with the full and fair review of her claim to which she is entitled.

### Discovery Issues

■ Because the court is remanding this matter for further proceedings, it is appropriate to address a discovery issue that has led to dispute. On remand, the issue of a potential conflict of interest between the plan administrator's fiduciary obligations to plan participants and personal self-interest becomes relevant. A court reviewing a denial of employee benefits under 29 U.S.C. § 1132(a)(1)(B), applies an "arbitrary and capricious" standard of review to a plan administrator's actions if the plan grants discretionary authority to determine eligibility for benefits or to construe the plan terms.[14] However, if a party contends that the administrator operated under a conflict of interest, this court grants less deference to the administrator's decision.[15] On May 2, 2002, Judge Stewart ordered limited discovery regarding any such conflict of interest. This order was quite appropriate. The Tenth Circuit has held repeatedly that determination of the financial interest of the plan administrator in their employers is a relevant consideration when considering a denial of a claim by a self-funded plan.[16] Here, Judge Stewart specified in his order:

Plaintiff is permitted, if she so desires, to seek discovery on the narrow issue of *whether a conflict of interest exists* be-

---

10. *See Jones v. Kodak Medical Assistance Plan,* 169 F.3d 1287, 1292 (10th Cir.1999) citing *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.,* 32 F.3d 120, 126 (4th Cir. 1994).

11. *Id.*

12. *Sandoval,* 967 F.2d at 382 *internal citations omitted.*

13. *Sandoval,* 967 F.2d at 380 *internal citations omitted.*

14. *Charter Canyon Treatment Center v. Pool Co.,* 153 F.3d 1132, 1135 (10th Cir.1998) *citing Firestone Tire & Rubber v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

15. *Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1097 (10th Cir.1999); *see also Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 825 (10th Cir.1996).

16. *See Kimber,* 196 F.3d at 1097; *Jones,* 169 F.3d at 1290; *Chambers,* 100 F.3d at 825.

tween the Plan Administrator of the plan and Wal–Mart Stores, Inc., the plan sponsor. Plaintiff is precluded from any other discovery, including, but without limitation, any discovery relating to whether any purported conflict of interest tainted the benefit determination made by the Plan Administrator in this case.[17]

 In light of this order, the Plan's refusal to allow Kris Howard to answer questions regarding her financial stake in Wal–Mart was inappropriate. The Plan's further refusal to provide even the names of the members of the Committee likewise clearly violates this order. Confirming this conclusion, at oral argument current counsel for Wal–Mart candidly (and commendably) conceded he would have chosen a different course of action had he been present at the deposition.

Counsel for Wal–Mart further argued that, given the huge size of Wal–Mart, any financial holdings by Committee members would be *de minimis*. The court is not blind to that possibility, and this assertion may well turn out to be correct. But the way to resolve this issue is through discovery of the facts, not speculation about conclusions.

Accordingly, to resolve this discovery dispute, the court orders the Plan to provide Ms. Nichols' counsel the name of the members of the Committee who will review Ms. Nichols' claim and the approximate size (to the nearest $10,000) of their financial stake in Wal–Mart Stores, Inc. To protect the privacy interests of Committee members, the court will allow this discovery to occur under a protective order limiting the use of the materials to counsel in this matter for this matter only. Counsel for both sides are directed to meet and confer promptly to draft an appropriate order for the court's approval.

17. J. Stewart's order, May 2, 2002.

## Remand

 At the direction of the court, the parties briefed the issue of the scope of the remand order. The court has carefully reviewed those supplemental briefs. To be sure, in a normal case, a remand without further instructions might well suffice to resolve the matter. But this case seems to be quite unusual. Not only are the medical facts relatively complicated, but the court has already remanded it once and the parties seem to be at odds about how the remand ought to proceed. In the interest of facilitating an expeditious conclusion to this case, the court will therefore provide detailed guidance to the parties. The court directs the following procedures for the remand (in addition, of course, to compliance with all applicable ERISA requirements for a full and fair review):

1. This matter is remanded to the Plan for a full and fair review under the following conditions:

A. The Plan shall have 90 days from the entry of this order (the "Review Deadline Dale") to complete the administrative appeal process for Ms. Nichols' claims.

B. By the Review Deadline date, the Plan shall communicate the final results of their review and decision regarding Ms. Nichols claims.

C. During the 90 days, the Plan's Committee shall comply with ERISA requirements and:

1) Perform a careful review and give consideration to all materials previously submitted to the Plan by Ms. Nichols in all prior administrative reviews and prior litigation;

2) To the extent practical, minimize the cost of claims settlement for both parties;

3) Address any substantial conflicts of interest within the Committee;

4) Request from Ms. Nichols' counsel any additional information the Committee needs to make a reasoned decision;

5) Respond in writing within 21 days of the entry of this order to Ms. Nichols' counsel to the following questions:

a) Where can definitions of the terms "elective abortions," "elective surgery," or "elective termination of pregnancy" be found in the 1995 Summary Plan Description (SPD) or related documents?

b) Provide the definition of, or criteria for what constitutes, an "abortion" as that term is used in the 1995 SPD, and any supporting materials for that definition.

c) Does the definition of "abortion" include "miscarriage"?

d) If the answer to the previous question is no, identify what is the difference between an "abortion" and a "miscarriage."

e) How does the Plan distinguish between "elective abortions" and "miscarriages"?

f) Does the definition of "abortion" include an analysis of fetal viability and, if so, how does the Plan determine viability?

g) In evaluating Ms. Nichols' claim, did the Plan consider her fetus viable? Why or why not?

h) Finally, why did the Plan pay benefits to the anesthesiology department for Ms. Nichols treatment, yet refuse to pay benefits to the hospital and treating physician for the same treatment.

6) Respond within 21 days to the following questions to Ms. Nichols' counsel, or explain promptly to the court why it is not practical to do so.

a) Has the Plan ever paid benefits for treatment involving complications in pregnancy of the type suffered by Ms. Nichols under the 1995 SPD language or similar language? If so, on how many occasions?

b) Has the Plan ever paid benefits for treatments that involve fetal abnormalities that threaten the health of the mother? If so, on how many occasions?

7) Disclose any information not previously disclosed to Ms. Nichols that the Plan relied upon in making their decision; and

8) Communicate actively with Ms. Nichols, and her counsel, regarding the status of these claims.

D. If the Plan's decision is to maintain a denial, provide Ms. Nichols with a list of all materials and evidence relied upon by the Plan in making its decision. This list must be provided to Ms. Nichols' counsel in sufficient time to allow her to address the accuracy and reliability of this evidence no less than five days prior to the Review Deadline Date.

E. The entire review process must be completed by the Review Deadline Date. The plan must provide a written explanation of its decision, the evidence considered in making the decision, and the underlying rationale for the decision.

F. If the Plan has not communicated its final decision to Ms. Nichols' counsel by the Review Deadline Date, judgment shall be entered in favor of Ms. Nichols on her 29 U.S.C. § 1132(a)(1)(B) claim for benefits. Ms. Nichols may then request that the Court render a decision on the issues of prejudgment interest, attorneys' fees; and statutory damages under 29 U.S.C. § 1132(c)(1).

G. If the Plan's decision on the Review Deadline Date is to maintain its denial of

Ms. Nichols' claims, Ms. Nichols' may request that the Court review the Plan's decision. Any such request for review shall be filed with 30 days of the Review Deadline Date.

H. This court shall have continuing jurisdiction over this matter, and the case shall remain open pending final disposition of all issues in the case, including any subsequent request for attorneys fees under 29 U.S.C. § 1132(g), statutory damages under 29 U.S.C. § 1132(c)(1), and interest. Any such request shall be filed within 30 days of the Review Deadline Date.

### Attorneys Fees

Without ruling on the merits of Ms. Nichols' requests, the court denies Ms. Nichols Nichol's motion for attorneys fees, costs, prejudgment interest and statutory damages under 29 U.S.C. § 1132(c)(1) at this time. Ms. Nichols may well be entitled to some of these things, but it makes sense to handle these matters in one consolidated proceeding at the conclusion of the case. At the time, the court will have before it all relevant information necessary to make an appropriate decision. Ms. Nichols shall file any such request within 30 days of the Review Deadline Date, and include appropriate supporting materials.

### CONCLUSION

The court GRANTS in part Ms. Nichols' motion for summary judgment on the issue of lack of "full and fair review" only (# 63–1) and remands for further proceedings. In light of this disposition, the court DENIES Ms. Nichols' motion for summary judgment with respect to the payment of her claim and, concomitantly, DENIES the Plan's motion for summary judgment (# 35–2) and the Plan's motion to affirm the decision of the administrative committee (# 35–1).

The court DENIES without prejudice Ms. Nichols' motion for summary judgment regarding attorney's fees, costs, prejudgment interest and statutory damages, at this time, with leave to raise this issue again after remand (# 63–1). The court REMANDS this case to the Wal-Mart Plan Administrative Committee for proceedings consistent with this order, as explained in detail above, and retains jurisdiction over this matter to insure compliance with its order. The case will, therefore, remain open.

SO ORDERED

### ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION TO ALTER JUDGMENT

This matter is before the court on the motion of the defendant ("the Plan") to alter or amend judgment pursuant to Fed. R.Civ.P. 59(e). Under Rule 59(e) a court may grant a motion to alter or amend judgment if the moving party can establish the need to correct "clear error" or to prevent "manifest injustice." [1] In this case, the Plan argues that the court's previous opinion contains two errors that should be corrected. The court will discuss each of these alleged errors in turn.

### Discovery Production

The Plan first contends that the court's previous opinion incorrectly stated that it did not timely respond to Ms. Nichols's request for admission. This dispute centers around the exact date on which Plan mailed its responses and the address to which the responses were sent. In light of the court's previous rulings in favor of plaintiff on other grounds, it is unnecessary for the court to resolve this issue at this time. Therefore, the court will amend judgment to the extent of reflecting the

---

1. *Brumark Corp. v. Samson Resources Corp.,* 57 F.3d 941, 948 (10th Cir.1996).

Plan mailed responses to the request for admissions, and it remains disputed whether the response was timely and mailed to the correct address.

## Committee Membership

The court also indicated in its opinion that the Plan refused to provide the names of the members of the Administrative Committee. To clarify, the court was referring to the Plan's unwillingness to provide the names of the Committee members at the deposition of Ms. Howard, despite the fact Judge Stewart's ruling had previously stated that this information was discoverable. The court notes it took the Plan 88 days to finally provide the list of names to Ms. Nichols' counsel. But, in the interest of clarity, the court will amend judgment to acknowledge that the Plan did ultimately, though not in a timely fashion, provide the list of members of the Administrative Committee to opposing counsel.

To be clear, neither of these points changes the court's ruling or alter any of the deadlines currently set in this matter.

## CONCLUSION

The court GRANTS the Plan's motion to amend its ruling regarding production of Discovery Requests, as explained above. The court GRANTS the Plan's motion regarding providing the names of the members of the Committee, but notes that these names were not provided in a timely fashion.

SO ORDERED.