**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 6 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

CHARTER CANYON TREATMENT
CENTER,

      Plaintiff-Appellee,

vs.

POOL COMPANY,

      Defendant-Appellant.

Nos. 97-4063
97-4123

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 95-CV-424-C)

---

Bruce J. Douglas (Tim Dalton Dunn and Kevin D. Swenson, Dunn & Dunn, Salt
Lake City, Utah, with him on the brief), Larkin, Hoffman, Daly & Lindgren, Ltd.,
Bloomington, Minnesota, for Defendant-Appellant.

Brian S. King (N. Brent Jones, Lawler & Jones, and Richard R. Burke, King &
Isaacson, P.C., with him on the brief), King & Isaacson, P.C., Salt Lake City,
Utah, for Plaintiff-Appellee.

---

Before **SEYMOUR**, **EBEL**, and **KELLY**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

Defendant-Appellant Pool Company appeals from the district court's grant

of summary judgment and award of attorney's fees in favor of Plaintiff-Appellee

Charter Canyon Treatment Center (Charter). At issue is the administration of

Pool Company's Medical Expense Plan (the Plan), an employee welfare plan

governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C.

§§1001-1461 (ERISA). The Plan provides medical benefits to Pool Company's

employees and their dependents. The district court held that Pool Company's

decision to conduct a retrospective utilization review was without basis in Pool

Company's medical plan documents; thus, Pool Company's subsequent denial of

medical benefits could not be sustained under any standard of review. Our

jurisdiction arises under 28 U.S.C. § 1291. We reverse, vacate the award of

attorney's fees, and remand for further proceedings consistent with this opinion.

Background

From March 29, 1991 to April 25, 1991, Charter, a mental health care

facility, provided inpatient medical care to Austin Lyman (Austin), the son of

former Pool Company employee Cleo Lyman (Mr. Lyman). After terminating

employment with Pool Company, Mr. Lyman had elected to temporarily retain

continued coverage under Pool Company's self-funded Plan, [1] and both he and

Austin were beneficiaries of the Plan. Austin, who was fourteen years old at the

_____

[1]ERISA requires that plans provide continuing coverage to certain qualified beneficiaries upon termination of their employment in certain circumstances. See 29 U.S.C. § 1161.

2

time of his hospitalization, was diagnosed by Dr. Delbert Pearson prior to admission with major depression, single episode resulting from a classmate's accusation of rape. The accusation, according to Dr. Pearson, engendered homicidal and suicidal thoughts which Austin expressed. Upon admission to Charter, Dr. Pearson ordered that Austin be placed on a 15-minute suicide watch and suicide precautions.

The master Plan documents and the Summary Plan Description (Summary) which were provided to all insureds state that inpatient treatment for mental or nervous disorders would be approved "only when the patient is diagnosed as being an imminent threat to himself or others; e.g., suicidal or homicidal," as demonstrated by placement of the patient on suicide precautions. See Aplt. App at 64-65; id. at 273. The Plan also requires pre-certification review, a "screening process by medical professionals designed to help you and your doctor determine if hospitalization is really the best treatment," prior to any hospitalization. Aplt. App. at 276; see id. at 44 ("pre-admission requirements" defined as "actions as may be required . . . prior to non-emergency hospital confinement . . . to ensure that neither covered persons nor the Company incur avoidable hospitalization costs . . ."). Should a Plan beneficiary fail to utilize pre-certification review prior to hospitalization, a $500 deductible will not be waived and "no benefits will be paid by the Plan for any treatment or period of hospitalization that is not

3

determined to be medically necessary." Aplt. App. at 276.

Pursuant to the Plan's requirement of pre-admission certification of inpatient care, Charter contacted Pool Company's utilization review contractor Quality Inc. (Quality) prior to Austin's admission to obtain such certification. At least initially, Quality withheld pre-certification of Austin's inpatient treatment until its psychiatric consultant, Dr. Karyn Hall, could discuss Austin's case with Dr. Pearson, his treating physician. Quality's initial pre-certification of Austin's treatment was based on telephone conversations between Dr. Pearson and Dr. Hall. From approximately April 9 until Austin's discharge on April 25, Quality's physicians (Dr. Hall and Dr. Ferrero) pre-certified Austin's extended stays based on medical records provided by Charter, including lab results, nurse and physician progress and treatment notes, and psychological evaluations.

Throughout Austin's treatment at Charter both Mr. Lyman and Charter were provided periodically with notice of Quality's pre-certification of Austin's entire hospitalization, either telephonically or by letters granting an extension of hospital stay. The letters sent to Mr. Lyman stated that "[a]pproval does not guarantee payment. Payment is subject to eligibility and coverage at the time the services are rendered and need to be verified with the claim administrator." Aplt. App. at 141, 147. The letters sent to Charter contained no such disclaimer, but prior to Austin's admission Charter had obtained an assignment of medical

4

insurance benefits and a guarantee of payment for services from Mr. Lyman.

In May 1991, shortly after Austin's discharge from Charter, Louise Winger, Pool Company's medical claims manager, submitted Austin's file to Quality for retrospective review of the claim based on perceived inconsistencies in the medical records. Quality submitted the records to Dr. Hall, who had previously pre-certified Austin's stay, for independent medical review. After reviewing the records in light of the Plan's provisions, however, Dr. Hall concluded:

> [t]he patient did not appear to have a plan for harming himself or others. Alcohol abuse and continuing symptoms of ADHD appears [sic] to be the primary concern. In fact the records reflect that the patient stated he had no plans. The outpatient sessions were apparently related to alcohol abuse treatment. There is no evidence that medication was attempted on an outpatient basis.
> It is my understanding that the insurance plan does not cover alcohol abuse nor does the plan cover depression for someone who is depressed but not an immediate danger to himself or others.

By letter dated July 3, 1991, Pool Company denied coverage for Austin's treatment at Charter. The letter stated in pertinent part:

> The medical records were reviewed by an independent psychiatric consultant who found that the patient did not appear to have a plan for harming himself or others; and the records reflect that the patient stated that he had no plans. The consultant also found that alcohol abuse and the continuing symptoms of ADHD appear to be the primary concerns.
> In summary, the claims were denied because your son was not an imminent threat to himself or others and there was no evidence in the records of his treatment that the severity of any disability was of sufficient magnitude to justify acute hospital intervention or that the

intensity of the treatment was such that it could only be delivered in an acute inpatient setting.

Having been assigned Mr. Lyman's right to recover benefits, Charter appealed Pool Company's denial of payment to the Plan administrator. Charter provided the Plan administrator with additional information from Dr. Pearson by letter dated August 6, 1991 reaffirming that Austin had expressed homicidal and suicidal thoughts. See Aplt. App. at 292-93. The Plan administrator requested a second independent medical review. That review was performed by Dr. Ferrero. In his report, Dr. Ferrero, who also had earlier pre-certified Austin's stay, changed his mind after reviewing the charts in light of the Plan provisions:

> Under conditions of policy included with material reviewed, I believe diagnosis and treatment was primarily directed toward alcohol abuse, personality disorder, and adjustment disorder, and therefore benefits are not available for treatment delivered.
> The letter of 8-6-91 from AP [attending physician Dr. Pearson] notes the suicidal and homicidal thoughts and statements but these are not found in the original material. The notes about depression do not seem to justify the conclusions concerning the necessity for the care given.

Aplt. App. at 245. The Plan administrator ultimately affirmed the denial of Charter's claim for the same reasons provided in the initial denial.

Charter then filed this suit in Utah state court and Pool Company removed the action to federal district court. The parties filed cross-motions for summary judgment, and the district court granted summary judgment in favor of Charter, denying Pool Company's motion. The district court held that the phrase

6

"retrospective review" was ambiguous and that a reasonable beneficiary would believe Pool Company's plan documents, particularly the Summary, allow Pool Company to conduct a retrospective review only if prior approval was based on misrepresentations by the physician, patient, or facility. Accordingly, the district court held that Pool Company's denial of Charter's claim was without basis in the Plan documents, and could not be upheld "under any standard of review." Aplt. App. at 323. Pool Company moved to alter or amend the judgment, arguing, among other things, that the district court employed the incorrect standard of review, and the district court denied the motion.

Charter then moved for attorney's fees pursuant to 29 U.S.C. § 1920 and § 1924, and after a hearing and oral argument, the district court awarded Charter $26,419 in attorney's fees, $2,998 in costs, and post-judgment interest. Pool Company appeals the district court's grant of summary judgment and award of attorney's fees and costs.

Discussion

We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court.    See Siemon v. AT&T Corp., 117 F.3d 1173, 1175 (10th Cir. 1997). Summary judgment is properly granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law," construing the facts and

7

reasonable inferences which may be made from the record in the light most favorable to the non-moving party. Fed. R. Civ. P. 56(c); _see_ Blue Circle Cement, Inc. v. Board of County Comm'rs_, 27 F.3d 1499, 1503 (10th Cir. 1994).

A court reviewing a challenge to a denial of employee benefits under 29 U.S.C. § 1132(a)(1)(B) applies an "arbitrary and capricious" standard to a plan administrator's actions if the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms. _See_ Firestone Tire & Rubber Co. v. Bruch_, 489 U.S. 101, 115 (1989) (holding de novo review inapplicable where plan grants administrator discretion to construe terms of plan); Adams v. Cyprus Amax Minerals Co._, No. 97-1105, 1998 WL 396565, *3 (10th Cir. July 16, 1998); Siemon_, 117 F.3d at 1177. Where the plan administrator operates under a conflict of interest, however, the court may weigh that conflict as a factor in determining whether the plan administrator's actions were arbitrary and capricious. _See_ Chambers v. Family Health Plan Corp._, 100 F.3d 818, 824-27 (10th Cir. 1996). The parties agree that this modified standard of review governs this case; Pool Company's self-funded Plan, which names the Company as the Plan administrator, grants the Company "the exclusive right to interpret the Medical Plan and to decide all matters arising thereunder." Aplt. App. at 93; _see_ _id._ at 91.

The parties' agreement aside, Pool Company argues that the district court

8

failed to apply this standard in this case, insisting that the district court's interpretation of the Plan documents limiting the scope of retrospective review was, in essence, a de novo review of the Plan administrator's actions. See Aplt. Brief at 11-13; Aplt. App. at 322-23. Charter, however, asserts that given Pool Company's "gross disregard" of the limitations on retrospective review found in the plan documents, the most deferential review possible could not excuse Pool Company's refusal to pay the claim. See Aplees. Brief at 20-22. In the alternative, Charter argues that even if the administrator was entitled to conduct a full retrospective review, Charter is entitled to summary judgment because Pool Company's denial of its claim was arbitrary and capricious.

Given the deferential standard of review required, our inquiry focuses on "whether defendant's interpretation of its plan is reasonable." See Semtner v. Group Health Serv. of Oklahoma, Inc., 129 F.3d 1390, 1393 (10th Cir. 1997). This standard of review is tempered by our recognition of Pool Company's possible conflict of interest arising from its concurrent funding and administration of the Plan. See, e.g., McGraw v. Prudential Ins. Co. of Amer., 137 F.3d 1253, 1259 (10th Cir. 1998).

The district court held that "[s]ince the plan documentation nowhere explicitly defined what a 'retrospective review' is, the nature and scope of defendant's right to conduct such a review is at least ambiguous." Aplt. App. at

9

321.  We disagree.  The master Plan documents grant the Plan administrator the power to conduct retrospective reviews to ensure Pool Company does not incur avoidable costs.  The Plan specifically provides:

> The administration of the Medical Plan shall include pre-admission reviews, length of stay reviews, utilization reviews, retrospective reviews, audits and managed care; each and all of which to such extent as is appropriate to ensure that neither covered persons nor the Company incur avoidable hospitalization or other costs in obtaining quality appropriate medical care covered by the Medical Plan.

Aplt. App. at 88.    This grant of power gives the plan administrator the authority to conduct a retrospective review to ensure treatment is covered under the Plan.

Notwithstanding the Plan's language allowing retrospective review, Charter brings our attention to the Summary's discussion entitled "What About Other Utilization Review?":

> It is extremely important that both you and your doctor or hospital are completely honest with the pre-certification professionals.  For example, if your hospitalization for a weight reduction or a drug rehabilitation program is pre-certified on the basis of a diagnosis of major depression because you and your doctor know that the actual reason for the hospitalization is not covered by the Medical Plan, you will probably be personally liable for the entire cost of the treatment.

Aplt. App. at 277.  Charter argues that the Summary limits the Plan administrator's discretion to conduct retrospective review to situations where the Plan administrator has reason to believe pre-certification was based on active misrepresentations by the physician, patient or facility.      See Aplees. Brief at 17-

10

19; Semtner, 129 F.3d at 1393 ("When the summary plan description and the plan language differ, the summary plan description is binding.").  Alternatively, Charter asserts that at a minimum the Summary's language renders the Plan administrator's right to conduct retrospective review ambiguous, and requires us to construe the Plan in favor of the insured.  See Aplees. Brief at 23-24; Blair v. Metropolitan Life Ins. Co., 974 F.2d 1219, 1222 (10th Cir. 1992).

We reject Charter's arguments for two reasons.  First, it is axiomatic that if a summary's language can trump language contained in the master plan documents in the event of a conflict, the documents must actually conflict.  If the plan documents do not conflict, the important policy of protecting beneficiaries from misleading or false information contained in a summary plan description is not implicated.  Thus, a summary plan description which is silent on a specific term or issue cannot prevail over the master plan document.  See, e.g., Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan, 1998 WL 228144, at *8 (7th Cir. May 8,1998); Sprague v. General Motors Corp., 133 F.3d 388, 401 (6th Cir.) (en banc), cert. denied, 66 U.S.L.W. 3782 (June 8, 1998); Jensen v. SIPCO, Inc., 38 F.3d 945, 952 (8th Cir. 1994), cert. denied, 514 U.S. 1050 (1995); Wise v. El Paso Natural Gas Co., 986 F.2d 929, 938 (5th Cir.), cert. denied, 510 U.S. 870 (1993).

The Summary does not mention retrospective review, but the master Plan

11

documents set forth the plan administrator's right to engage in such review. Thus, the Summary's silence creates no direct conflict with the master Plan documents. Nor does the Summary's admonition against misrepresenting material facts during the utilization review process mislead beneficiaries into believing that retrospective review of a claim will only be undertaken if misrepresentations are made to utilization review personnel. The Summary simply warns that payment will likely be withheld if pre-certification for treatment is based on a diagnosis for which treatment is covered, but treatment is actually undertaken for a condition which is not covered by the Plan, an assertion which is consistent with conducting retrospective reviews "to ensure that neither covered persons nor the Company incur avoidable hospitalization or other costs." Aplt. App. at 88. In any event, the passage relied on to limit retrospective review is exemplary, not exclusive.

Further, the Summary clearly states that not all Plan provisions are addressed therein and that the master Plan documents govern in the event of conflict between the Summary and the master Plan. See Aplt. App. at 264, 288. This Circuit has previously given effect to such disclaimers, at least where the master Plan documents grant broader coverage than does the Summary. See McGee v. Equicor-Equitable HCA Corp., 953 F.2d 1192, 1201 (10th Cir. 1992); see also Parker v. Bankamerica Corp., 50 F.3d 757, 769 (9th Cir. 1995)

(involving inter-office memorandum);  Gillis v. Hoescht Celanese Corp. , 4 F.3d 1137, 1142 (3d Cir. 1993),  cert. denied , 511 U.S. 1004 (1994)  . Given that the Summary's silence regarding the scope of retrospective review creates no conflict and the master Plan documents broadly allow retrospective review, we see no reason why the Summary's disclaimer should not operate.

Because the Plan documents allow retrospective review, the district court erred in holding that Pool Company's decision to retrospectively review Charter's claim could not be upheld under any standard of review. In light of its disposition, however, the district court did not decide whether the Plan administrator's ultimate denial of benefits was arbitrary and capricious and influenced by Mr. Lyman's temporary continuation of coverage. Charter has made an evidentiary showing that having continually pre-certified Austin's hospitalization based upon satisfactory evidence of suicidal or homicidal threats, the Plan administrator did an about-face after retrospective review, focusing instead upon the Plan provisions that deny coverage for treatment of alcohol abuse. Charter relies upon not only the circumstances surrounding the decision to retrospectively review, but also the fact that the same contract medical personnel that pre-certified for the Plan administrator were later called upon to perform the retrospective review and reached a completely different conclusion. The Pool Company disputes any improper motivation and claims that it had

13

legitimate reasons for its decision, including additional information at the time of retrospective review. We express no opinion on the merits, other than to say that genuine issues of material fact remain that will require a bench trial. See Adams, 1998 WL 396565, at *6. We thus REVERSE the judgment of the district court, VACATE the district court's order granting attorney's fees to Charter, and REMAND for further proceedings consistent with this opinion.