**Lee Anne SMITH, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

**No. CIV.03–B–916(BNB).**

United States District Court, D. Colorado.

Nov. 8, 2004.

698

Kenneth J. Shakeshaft, Shakeshaft, Chernushin & Donohoe, P.C., Colorado Springs, CO, for Plaintiff.

Steven M. Gutierrez, Holland & Hart, LLP, Greenwood Village, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

This is an ERISA action for insurance benefits allegedly due Plaintiff Lee Anne Smith ("Plaintiff"). Defendant Metropolitan Life Insurance Company ("Defendant") moves for summary judgment on Plaintiff's claim. Defendant brings two counterclaims, one under ERISA for reimbursement of overpaid benefits, the second for unjust enrichment. Plaintiff moves for summary judgment on Defendant's counterclaims. Defendant moves for summary judgment on its counterclaims as well. I address all three motions in this Order, grant both of Defendant's motions, and deny Plaintiff's motion.

## I. Undisputed Facts

Plaintiff seeks to recover on a long-term disability plan ("the Plan") sponsored by her former employer, Electronic Data Systems Corporation ("EDS"). The plan is funded by a group insurance policy issued to EDS by Defendant. C/O at ¶ 6. The Plan is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § § 1001, *et seq.* *Id.* To receive benefits under the Plan, an eligible participant must be "disabled" as defined by the Plan. *See* Ex. A–1 at Bates No. ML301.

The Plan defines "Disabled" for the initial 24 months of coverage: due to sickness, pregnancy, or accidental injury, the participant is unable to earn more than 80% of her pre-disability earnings working in her own occupation. *Id.* at ML302. In order to remain eligible for benefits beyond the first 24 months of coverage, the participant must demonstrate a continuing disability under the terms of the Plan in that she is unable to earn more than 60% of her pre-disability earnings working in any gainful occupation for which she is reasonably qualified, taking into account her training, education, and expertise. *Id.* Defendant is the Claims Fiduciary under the Plan. It also interprets the Plan and has discretionary authority to determine claims under the Plan.

Plaintiff's last day of work at EDS was October 29, 1999. *See* Ex. B–1. She filed her disability claim on December 26, 1999, stating symptoms associated with Lyme disease, including chronic joint and muscle pain, fever, fatigue, and migraines, that prevented her from performing the duties of her job. *Id.* On December 28, 1999,

Defendant acknowledged receipt of Plaintiff's claim and asked for additional information. *Id.* Defendant then sent two more letters requesting additional information, on January 24, 2000 and February 28, 2000. *Id.*

On March 30, 2000, after receiving additional information, Defendant approved Plaintiff's claim. *Id.* at ML089–091. In the letter approving her claim, Defendant explained that Plaintiff would only be eligible after 24 months for continued disability payments if she met the applicable definition of "totally disabled" at that time.

Plaintiff's family doctor, Dr. James Richard, completed an Attending Physician Statement and Physician's Report of Physical Capacity on December 10, 2001 in which he indicated that the Plaintiff was capable of sitting up to four hours, standing up to two hours, walking up to two hours, using her hands in repetitive, fine motor movements up to four hours, and could work up to four hours a day. *Id.* at ML174–180. On April 3, 2002, Dr. Richard completed an Attending Physician Statement in which he indicated that Plaintiff was capable of sitting up to four hours, standing up to two hours, walking up to one hour, using her hands in repetitive, fine-motor movements, and could work up to three hours a day. *Id.* at ML163–165.

On April 5, 2002, Defendant referred Plaintiff's claim for an independent physician consultation to determine whether Plaintiff, on the 24–months–later, "any-occupation" date of April 27, 2002, would still be disabled and whether Plaintiff was under appropriate care for her condition. *Id.* at ML166–167. On April 26, 2002, Defendant's independent physician consultant, Dr. Gary Greenhood, certified by the American Board of Internal Medicine and Infectious Diseases, issued a Physician Consultant Review. *Id.* at ML153–156. He found that Plaintiff's medical file contained no objective documentation, such as serological tests, to confirm a diagnosis of Lyme disease. *Id.* Dr. Greenhood further found that the treatment for Lyme disease received by Plaintiff was not consistent with current guidelines, and that Plaintiff should have been seen by an infectious disease specialist. *Id.*

On May 3, 2002, Defendant requested from Dr. Richard additional records and serological tests for Plaintiff dating back to January 2001. *Id.* at ML148. The medical information that Dr. Richard sent to Defendant in response contained no documentation relating to the diagnosis of Lyme disease. *Id.* at ML141–147. Defendant sent this information to Dr. Greenhood on July 21, 2002 for a follow-up consultation. On June 24, 2002, Dr. Greenwood issued an addendum to his April 26, 2002 report. In it he stated that the additional information submitted by Dr. Richard did not contain any objective documentation of a Lyme disease diagnosis, so his opinions remained unchanged. *Id.* at ML149–152.

On June 27, 2002, Defendant informed Plaintiff it had determined there was a lack of objective data to support a diagnosis of Lyme disease and no medical documentation to support any other diagnosis that would preclude Plaintiff from performing the tasks of her own or any other occupation commensurate with her training, education, and experience. Therefore, Defendant informed her, she did not meet the applicable definition of disabled under the Plan and Defendant was terminating her benefit payments. *Id.* at ML136–138. Defendant told Plaintiff she had 180 days to appeal the decision.

On November 8, 2002, Plaintiff's counsel asked for an extension of time to appeal. On November 27, 2002, he provided Defendant with a letter and test results from

February 3, 1992 indicating Plaintiff had received a diagnosis of Lyme disease. *Id.* at 398–399. He also enclosed an MRI report from May 1, 2002, to confirm that Plaintiff had arthritis.

Dr. Mark Moyer, board certified in internal medicine and infectious disease, completed an independent consultation for Defendant on January 20, 2003. He reviewed all treatment records, and determined that they provide support for the presence of sinusitis, asthma, Lyme disease, and a possible diagnosis of Bechet's Syndrome. *Id.* at ML060. However, Dr. Moyer found that Plaintiff's medical records do not document impairments or limitations such as lack of stamina or neuromuscular or motor impairments sufficient to prevent Plaintiff from performing sedentary work. *Id.* at ML059. Dr. Moyer also provided an Estimation of Physical Capacities report indicating that, based on the medical records, Plaintiff can walk for up to one hour, stand for up to two hours, and engage in unrestricted sitting and hand movements over an 8–hour work day. *Id.* at ML062–063. This is consistent with the work she performed for EDS as a computer programmer.

On January 27, 2003, Defendant terminated Plaintiff's long-term disability benefits. Defendant discussed Dr. Moyer's report, explaining that while Plaintiff's medical information indicated a history of various medical conditions, a thorough review of her records did not indicate or document any testing for neuromuscular, motor, or cognitive functioning to support her subjective complaints of fatigue, pain, and lack of stamina. *Id.* at ML033. Thus, Defendant wrote, the medical records do not clearly demonstrate impairment, limitations, or deficits that would preclude a return to full-time, sedentary work. *Id.* Consequently, Defendant determined Plaintiff was no longer disabled

because she did not have a disability that was severe enough to keep her from engaging in any gainful occupation for which she is reasonably qualified. Between April 27, 2000 and April 26, 2002, Defendant paid Plaintiff a total of $63,000, until this final decision that she was not disabled.

## II. Law

### A. Summary Judgment

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). I shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

Where, as here, the parties file cross motions for summary judgment, I am "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *James Barlow Family Ltd. Pshp. v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir.1997), *cert. denied*, 523 U.S. 1048, 118 S.Ct. 1364, 140 L.Ed.2d 513 (1998). In this regard, each party as the non-movant is given "wide berth to prove a factual controversy exists." *Jeffries v. Department of Soc. & Rehabilitation Services*, 147 F.3d 1220, 1228 (10th Cir.1998).

### B. Standard of Review and Burden of Proof

The parties dispute which standard of review and burden of proof govern my assessment. The disagreement centers on a recent Tenth Circuit ERISA case, *Fought v. UNUM Life Ins. Co. of Am.*, 357 F.3d 1173 (10th Cir.2004), which is directly on point. At the time the parties were

preparing their summary judgment briefs, a motion for rehearing *en banc* was pending in that case. After the briefs were filed, the Tenth Circuit reheard the case, vacated 357 F.3d 1173, and decided 379 F.3d 997 (10th Cir.2004) in its place. To the extent the parties relied on *Fought* in its first incarnation, their reliance is now moot as to the holdings of that opinion. I now assess their arguments in light of the new *Fought* opinion, which surveys the standard-of-review landscape in ERISA cases.

As a threshold matter, I note Defendant contends that the first *Fought* case did not discuss insurance benefits, which are at issue here. Rather, it argues that the case dealt with insurance "coverage," defined by Black's Law Dictionary, 8th ed.2004, as "the risks within the scope of an insurance policy." Plaintiff Shirley Fought was denied long-term disability benefits for complications stemming from a post-operative infection incurred after she had elective heart surgery. Her insurance company denied benefits because it determined Mrs. Fought had coronary artery disease before her coverage began, so the complications were the result of a pre-existing condition and were not covered.

To the extent the case involved coverage, rather than benefits, the Tenth Circuit did not clarify the issue upon rehearing. Throughout the opinion, the court applies the terms in an overlapping, if not synonymous, manner. For example, it stated that "UNUM's plan administrator *denied coverage* by concluding that Ms. Fought suffered from a pre-existing coronary artery condition . . . ," *Fought* at 1176, and that "[t]here is no dispute here the plan expressly gives UNUM, as plan administrator, the discretion whether *to deny a claimant insurance benefits* under the plan," *Fought* at 1180.

I put this issue to rest. It is undisputed that Defendant here at once interprets the Plan language to decide if claims are covered and assesses claims to decide if benefits should be conferred. Since Defendant enjoys both types of discretion, whether coverage or benefits were more or less at issue in *Fought* is a moot point for the purposes of determining the standard of review and burden of proof here.

When the plan administrator has such discretion, "[a] court reviewing a challenge to a denial of employee benefits . . . applies an 'arbitrary and capricious' standard to a plan administrator's actions." *Fought* at 1180, citing *Charter Canyon Treatment Ctr. v. Pool Co.*, 153 F.3d 1132, 1135 (10th Cir.1998). "The review is limited to determining whether [the plan administrator's] interpretation was reasonable and made in good faith." *Id.*, citing *Hickman v. GEM Ins. Co., Inc.*, 299 F.3d 1208, 1213 (10th Cir.2002). "[A]ssuming full and expansive discretion has been conferred, then the plan administrator's interpretation of ambiguous plan provisions should be judged as follows: (a) as a result of reasoned and principled process (b) consistent with any prior interpretations by the plan administrator (c) reasonable in light of any external standards and (d) consistent with the purposes of the plan." *Id.*, citing Kathryn J. Kennedy, Judicial Standard of Review in ERISA Benefit Claim Cases, 50 Am. U.L.Rev. 1083, 1135, 1172 (2001). "Finally, in reviewing a plan administrator's decision under the arbitrary and capricious standard, 'the federal courts are limited to the administrative record-the materials compiled by the administrator in the course of making his decision." *Fought* at 1180, citing *Hall v. Unum Life Ins. Co.*, 300 F.3d 1197, 1201 (10th Cir.2002).

If an insurance administrator operates under a conflict of interest, however, the analysis changes. *See Fought* at 1180, cit-

ing *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir.2002) ("Indicia of arbitrary and capricious decisions include ... [a] conflict of interest by the fiduciary."). Therefore, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.* at 1180, citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). *See also, Pitman v. Blue Cross and Blue Shield of Oklahoma*, 217 F.3d 1291, 1296 (10th Cir.2000) (internal citations removed) ("[W]hen an insurance company serves as [an] ERISA fiduciary ..., it is exercising discretion over a situation for which it incurs direct, immediate expense as a result of benefit determinations favorable to plan participants.").

■ The Tenth Circuit has held that where a claim decision-maker is an employee of the insurer, the decision-maker's performance reviews or compensation is not linked to the denial of benefits, and the benefit decision at issue would not have a significant impact on the finances of the insurer, the theoretical conflict of interest is not so significant as to warrant such a change in standard or scope of judicial review. *See Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir.1999). And, where the potential total benefits payout is not substantial compared to the financial assets of the insurer, the significance of any conflict is minimal. *See Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1344 (7th Cir.1995).

The *Fought* court established the burden of proof where an insurance-company defendant is alleged to "wear two hats," one of a trustee or fiduciary and one of a claims settlor, but such has not been admitted or proven: "[w]e hold that in every case, ... the plaintiff is required to prove

the existence of the conflict." *Fought* at 1182. Under such a paradigm, the *Kimber* factors take effect. However, where there is an "inherent conflict of interest," such as where the defendant is admittedly or proven to be both insurer and administrator of the plan, the standard of review and the burden of proof change. In that case, "the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard ... [and] must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence. The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest." *Id.* at 1182–83.

■ Citing *Kimber* but without the benefit of the new *Fought* decision, Defendant contends there is no conflict of interest, or if one exists at all, it is *de minimus* because the potential total benefits payout to Plaintiff is tiny compared to the assets of Defendant. Neither party has provided evidence of a potential benefits payout sum or the assets of Defendant. That aside, Defendant does not contest, and it is undisputed, that it is both the insurer and the administrator of the Plan. Therefore, although Plaintiff does not provide evidence that Defendant "wears two hats," I conclude that Defendant-who is the claims fiduciary and has authority over claims decisions-has an inherent conflict of interest. Consequently, Defendant bears the burden to demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence. I note, however, that there is no

allegation by Plaintiff of any *Fought* "procedural irregularity" on the part of Defendant.

### III. Discussion

#### A. Defendant's Motion for Summary Judgment on Plaintiff's Claim

I address Plaintiff's minor arguments first. Plaintiff first contends that Defendant failed to meets its burdens under federal regulations relating to ERISA administration. Plaintiff does not demonstrate any failure, however, and Defendant's evidence leaves no doubt that Defendant complied with those regulations.

■ Second, Plaintiff contends that "there are objective industry standards for the adjustment of disability claims that Defendant must follow." Pltf's Resp. at 9. Plaintiff argues these are set out in C.R.S. § 10–3–1104 (Unfair Claim Practice and Settlement Act). ERISA preempts C.R.S. § 10–3–1104 because "the statute conflicts with ERISA's comprehensive framework for claims handling." *Kelley v. Sears, Roebuck & Co.*, 882 F.2d 453, 456 (10th Cir.1989). Moreover, to the extent Plaintiff attempts to inject elements of a bad-faith claim into its argument, such argument is wholly improper for I explicitly dismissed her bad-faith insurance claim on February 18, 2004. *See* Order, 2/18/04. And to the extent that Plaintiff attempts to introduce a "repudiation" claim as a basis for future benefits: 1) a response to a summary judgment motion is not the place to do so; and 2) Plaintiff provides no evidence of repudiation of any kind.

■ Third, Plaintiff contends Defendant should have given more weight to a Social Security Administration Determination in her favor. However, insurance-claim administrators are not bound by determinations made in Social Security benefits cases. *Pari–Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 420 (1st Cir.2000). This is because "[t]he criteria for determining eligibility for Social Security disability benefits are substantively different than the criteria established by many insurance plans...." *Id.*

■ Finally, Plaintiff argues that Defendant should have conducted an independent medical examination of Plaintiff's person. Defendant did commission two independent medical *investigations* of Plaintiff's record. Under *Fought*, however, independent physical exams are not required. Taking its cue from the Seventh Circuit, the *Fought* court held that "[w]hen it is possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Fought* at 1193, citing *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir.1998). And "seeking independent expert advice is evidence of a thorough investigation ...." *Id.* Moreover, where-as here-a conflict of interest may impede Defendant's impartiality, Defendant best promotes the purposes of ERISA by obtaining an independent evaluation. *See* 29 U.S.C. § 1001(b). Defendant did so twice.

Plaintiff next goes to great length in her response to highlight information in her medical record that she contends Defendant failed to consider. As Defendant points out, however, Plaintiff's assertions that Defendant's decision was misplaced focus more on differences between the ultimate *opinions* of her doctors and Defendant's doctors than on the *evidence* that Defendant had before it when it made its decision. Nothing in ERISA "suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on ad-

ministrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).

Defendant's review of Plaintiff's medical history and records was thorough. On two occasions, Plaintiff's own doctor, Dr. Richard, indicated that Plaintiff was capable of sitting up to four hours, standing up to two hours, walking up to two hours, using her hands in repetitive, fine motor movements up to four hours and could work up to four hours a day. Ex. B–1 at ML174–180. Defendant's reviewer, Dr. Greenwood, found that Plaintiff's file contained no objective documentation of Lyme disease. *Id.* at ML153. Dr. Greenwood requested more information from Dr. Richard, who sent it. *Id.* at 141–147. Dr. Greenwood, in a follow-up consultation, found that there was no objective documentation of Lyme disease in that information. *Id.* at ML141–152. On June 27, 2002, Defendant told Plaintiff there was no medical documentation to support a diagnosis of Lyme disease or any other disease that would preclude Plaintiff from performing the tasks of her own or any other occupation commensurate with Plaintiff's training, education, and experience, so she did not meet the definition of "disabled" after 24 months under the Plan. *Id.* at ML136–138.

Plaintiff appealed the decision, and sent Defendant test results from 1992 diagnosing Lyme disease and MRI results diagnosing arthritis. *Id.* at ML398–340. Despite Plaintiff's assertions that Defendant's independent reviewers failed to consider all of the relevant evidence, Defendant requested another physician consultation. This time, Dr. Moyer reviewed all of Plaintiff's treatment records and found support for the presence of sinusitis, asthma, Lyme disease, and a possible diagnosis of Bechet's syndrome. *Id.* at ML060. But Dr. Moyer found that Plaintiff's medical rec-

ords did not document impairments or limitations that would prevent her from doing her computer-programming job or any other sedentary work. *Id.* at ML059. And, Plaintiff's multi-page argument to the contrary, my review of Dr. Moyer's report convinces me that Dr. Moyer made his decision based on an analysis of the whole medical record, not based solely on the fact that Plaintiff took a ski vacation and a vacation to Mexico, which he only mentioned briefly in his report.

I note that none of the evidence provided by either Defendant or Plaintiff shows that any testing was done to support Plaintiff's subjective claims of pain, fatigue, and lack of stamina. And there is absolutely nothing that suggests Plaintiff's neuromuscular, motor, or cognitive abilities are impaired.

I conclude from my hard look at all of the evidence and arguments presented by Defendant there can be no genuine dispute that Defendant reasonably upheld termination of Plaintiff's benefits, and based its decision on substantial evidence. Therefore, I conclude that Defendant has met its *Fought* and Rule 56 burdens. There are no genuine issues of material fact that preclude summary judgment in Defendant's favor on Plaintiff's ERISA claim.

**B. Plaintiff's and Defendant's Motions for Summary Judgment on Defendant's Counterclaim**

Defendant brings two counterclaims, one under 29 U.S.C. § 1132(a)(3) (ERISA) for reimbursement in the form of "other equitable relief," and one under federal common law for unjust enrichment.

**1. ERISA § 1132(a)(3) Counterclaim**

It is undisputed that Plaintiff signed a reimbursement agreement in which she contracted with Defendant to promptly re-

fund all overpayments of long-term disability benefits that occur as a result of an offset based on Social Security disability payments she received. *See* Agreement to Reimburse, Ex. 2. Typically, Defendant reduces Plan participants' monthly benefit by an estimated Social Security disability benefit offset. Because the period between submission of an application for Social Security benefits and the initial award of benefits is typically long, the Plan allows the participant to forgo the estimated offset reduction in her monthly payments as long as she provides proof she has applied for Social Security benefits, signs a contract to pay back the amount of the offset, and authorizes the Social Security Administration to release award information directly to Defendant.

Plaintiff chose to receive higher payments from Defendant in return for this obligation to return overpayments. It is undisputed that Plaintiff has not refunded Defendant for the offset of $39,940.00. Her only defense is that Plaintiff's counterclaims "seems a remedy at law," rather than in equity.

In *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), the U.S. Supreme Court recognized that restitution actions in equity could be maintained under 29 U.S.C. § 1132(a)(3) when the plaintiff (here, Defendant-counterclaimant) seeks to impose a constructive trust or equitable lien on the defendant (here, Plaintiff) for "money or property identified as belonging in good conscience to the [Defendant]" which "could clearly be traced to particular funds or property in the [Plaintiff's] possession." *Id.* at 213–214, 122 S.Ct. 708. The court clearly stated that an action for restitution is equitable, and allowed under § 1132(a)(3), when it seeks the return of particular funds or property that: 1) can be traced to the Plaintiff's possession; 2)

belongs in good conscience to the Defendant; and 3) has not been dissipated so that no product remains. *Id.See also, Fick v. Metropolitan Life Ins. Co.*, 320 F.Supp.2d 1314, 1315 (S.D.Fla.2004) (a case on all fours with this case, involving the same Defendant and an identical fact pattern, where the court denied the plaintiff's motion to dismiss defendant's ERISA-restitution and unjust-enrichment counterclaims.).

■ Defendant's first counterclaim meets the *Knudson* requirements. It alleges the funds at issue are specific funds paid directly to Plaintiff, the Plan participant. *See* Counterclaim 1, ¶ 9–10. Defendant seeks imposition of a constructive trust. *See id.* at ¶ 18. And, the monies in good conscience belong to Defendant since Plaintiff is contractually obligated to pay the monies to Defendant because there was overpayment due to her receipt of Social Security benefits.

Holding that Defendant's counterclaim is valid, I conclude as a matter of law that the terms of both the Plan and the Agreement, along with ERISA § 1132(a)(3) require summary judgment in Defendant's favor.

### 2. Unjust Enrichment Counterclaim

■ Defendant brings an unjust-enrichment claim to recoup the overpayments at the heart of its ERISA counterclaim. The Tenth Circuit recognizes the use of the unjust-enrichment doctrine under certain circumstances. *See Trujillo v. Cyprus Amax Minerals Co. Retirement Plan Comm.*, 203 F.3d 733, 738 (10th Cir.2000) (It can be used "only when it does not 'override a contractual plan provision, and where its application would be consistent with ERISA's scheme and further its purposes.") The federal common law of ERISA allows insurance companies to recoup overpayments through unjust enrich-

ment because ERISA does not provide a specific mechanism for collecting such payments. *See, e.g., Rego v. Westvaco Corp.,* 319 F.3d 140, 149 (4th Cir.2003); *Ex. 8 Health Care Service Corp. v. Tap Pharmaceutical Prods., Inc.,* 2003 WL 21801636, *7 (E.D.Tex.2003).

The Middle District of Pennsylvania, while its decisions are not binding on this Court, expressed the rationale for this limited federal common-law scheme that overlays ERISA's explicit language in *Empire Kosher Poultry, Inc. v. United Food & Commer. Workers Health & Welfare Fund of Northeastern Pa.,* 285 F.Supp.2d 573, 581 (M.D.Pa.2003) (internal citations removed):

> In *Great–West [Knudson]*, the Court concerned itself entirely with the interpretation of an express statutory provision of ERISA, specifically § 1132(a)(3). In applying accepted doctrines of interpretation such as the plain meaning rule, the Court's goal was to give effect to the language enacted by Congress. Specifically rejected by the majority was an interpretation of § 1132(a)(3) based on broad and evolving notions of 'equity' as developed by courts in other cases. Rather, the 'job' of the Court in *Great–West,* as stated by Justice Scalia, was to follow the express language of Congress.

> In contrast to the analysis of *Great–West,* construction of the common-law remedy of equitable restitution is not confined to the terms of a specific provision. In *Plucinski v. I.A.M. Nat'l Pension Fund,* 875 F.2d 1052 (3rd Cir. 1989), where the Third Circuit recognized the federal common-law cause of action for restitution in benefit-fund case], the Third Circuit balanced the competing policy goals of ERISA-the desire to encourage employer participation by permitting the return of mistaken contributions and the need to protect fund integrity by regulating refund claims-and developed a limited cause of action for employers to recover overpayments. Like its origins, development of this doctrine cannot be tied to specific language of the statute but is, instead, guided by principles of equity as defined by the courts. Essentially, development of common law equitable restitution lies with the courts, to be guided, but not strictly controlled, by the terms of the statute.

> Thus, the analysis of *Great–West* is simply inapplicable to the federal common law claim of equitable restitution. The statutory language of § 1132(a)(3) that drove the Supreme Court's decision has no relationship to common-law restitution, which the Third Circuit developed from broad equitable principles underlying ERISA and the permissive language of § 1103(c).

For the purposes of this Order, I explicitly adopt this reasoning. Unjust enrichment is a claim recognized at equity, and the remedy for unjust enrichment-restitution-is a remedy in step with the equitable relief authorized by *Knudson.* Under *Trujillo,* I conclude that the claim's application is consistent with ERISA's scheme and furthers its purposes. Therefore, I grant summary judgment in Defendant's favor on this counterclaim.

ACCORDINGLY, IT IS ORDERED THAT:

1) DEFENDANT METROPOLITAN LIFE INSURANCE COMPANY's motion for summary judgment on PLAINTIFF LEE ANNE SMITHS's ERISA claim [36–1] is GRANTED;

2) DEFENDANT METROPOLITAN LIFE INSURANCE COMPANY's motion for summary judgment on its counterclaims [68–1] is GRANTED;

707

3) PLAINTIFF's motion for summary judgment on Defendant's counterclaims [60–1] is DENIED;

4) A constructive trust SHALL BE IMPOSED on PLAINTIFF for reimbursement of overpayments to DEFENDANT in the total amount of $39,940.00. To the extent that an award of prejudgment interest is based in equity, I exercise my powers in equity and DENY DEFENDANT's REQUEST for prejudgment interest;

5) DEFENDANT is awarded its costs; and

6) The Clerk of the Court SHALL ENTER JUDGMENT accordingly.