**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 6 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

WAYNE M. WOLBERG,

Plaintiff - Appellant,

v.

AT&T BROADBAND PENSION
PLAN; AT&T BROADBAND
EMPLOYEE BENEFITS
COMMITTEE,

Defendants - Appellees.

No. 03-1532

(D. Colorado)

(D.C. No. 02-RB-1627)

---

**ORDER AND JUDGMENT** *

---

Before **SEYMOUR** , **ANDERSON** , and **LUCERO** , Circuit Judges.

---

Wayne M. Wolberg brought this action against the appellees, AT&T

Broadband Pension Plan ("Plan") and the AT&T Broadband Employee Benefits

Committee ("Committee"), under the Employee Retirement Income Security Act,

29 U.S.C. §§ 1001-1461 (ERISA), alleging that the Committee failed to provide

him with pension benefits in violation of ERISA, § 502(a)(1)(B), 29 U.S.C.

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

§ 1132 (a)(1)(B). [1] Specifically, Mr. Wolberg claims that the Plan Administrator and, on appeal, the Committee, wrongfully excluded $180,000 from the formula for calculating pension benefits payable to him. The Committee concluded that the $180,000 in question was not eligible for inclusion in Mr. Wolberg's benefit calculation because it was a special retention bonus specifically excluded from the definition of qualifying compensation under the terms of the Plan. Mr. Wolberg contended that it qualified as compensation in the form of either basic wages, a lump sum payment in the nature of a merit or performance award, a non-executive incentive, or incentive compensation.

The parties agreed on the basic facts of the dispute and submitted the case on cross-motions for summary judgment. The district court analyzed the case in a written opinion which upheld the decision of the Committee, and, subsequently, entered a judgment granting the defendants' motion for summary judgment, denying Mr. Wolberg's motion for summary judgment, and dismissing the action.

On appeal, Mr. Wolberg contends that the district court: (1) applied the wrong standard of review; (2) relied on nonexistent evidence; (3) erred by not ruling that the Plan fiduciaries abused their discretion when they refused to define disputed and, allegedly, ambiguous crucial Plan terms; and (4) erred by not

---

[1]Section 1132(a)(1)(B) authorizes civil actions by participants in a pension plan to recover benefits under a plan, to enforce the terms of a plan, and to clarify rights to future benefits under a plan.

concluding that the Plan fiduciaries' denial of Mr. Wolberg's claim is not supported by substantial evidence, not based upon a deliberate, reasoned process, and was arbitrary and capricious. He asks this court to reverse the district court and to direct the entry of judgment in Mr. Wolberg's favor as well as require that the appellees recalculate Mr. Wolberg's accrued pension benefits by including the disputed $180,000 in the pension benefit calculation.

For the reasons stated below, we affirm the judgment of the district court.

**BACKGROUND**

The facts are undisputed, well known to the parties, and set out in the district court's opinion. Accordingly we set out only those central facts necessary to our discussion of the issues.

In early 2000, AT&T Broadband acquired MediaOne Group, Inc. through a merger. Mr. Wolberg, who worked at MediaOne, was identified by AT&T as one of the experienced employees AT&T desired to retain to facilitate a successful merger transition. Accordingly, on May 2, 2000, AT&T offered Mr. Wolberg a temporary assignment as vice president-finance from the date of the merger through April 1, 2001. The offer, which was reduced to a written agreement dated May 2, 2000, and signed by Wolberg on July 10, 2000, described an initial assignment of three months during which Mr. Wolberg would assist with the

transition of the MediaOne Group Audit and Consulting Services function to AT&T Broadband; followed by work on special projects as assigned. For this work Mr. Wolberg would be paid an annual salary of $180,000, a 30% short-term incentive, and a retention bonus of $180,000, payable in a lump sum at the end of the one-year transition period, or in a prorated lump sum if he left prior to March 31, 2001. Since this agreement controls our analysis of this controversy, we set it out in its entirety, as follows:

> May 2, 2000
>
> Wayne Wolberg
> 9785 Maroon Circle
> Englewood, Colorado 80112
>
> Dear Wayne:
>
> We are pleased to confirm an offer of a temporary assignment at AT&T Broadband. You will hold the position of <u>Vice President - Finance</u>, effective upon the close of the MediaOne merger with AT&T Broadband. The initial assignment is for up to three months and is intended to assist with the transition of the MediaOne Group Audit and Consulting Services function to AT&T Broadband. Following the completion of that transitional assignment, you will be assigned to complete other special projects at my direction. This assignment is to conclude on <u>March 31 or</u> April 1, 2001.
>
> At the end of your temporary assignments, in the event you are not offered a comparable regular full time position you will be separated under the Enhanced Merger Related Severance Package.
>
> Upon assumption of your new job, the compensation package offered includes an annual salary of $180,000, a <u>30</u>% Short-term Incentive, and a <u>retention bonus of $180,000 payable at the conclusion of the assignment. In the event you leave prior to March 31, 2001 the</u>

retention bonus will be prorated . You will remain under the MediaOne (Group) Benefits Plan; please note these benefit plans may be modified in the future subject to the requirements set forth in the AT&T/MediaOne merger agreement.

If you accept this offer with AT&T Broadband and stay with the business for at least 6 months, you will have the full exercise term of any stock options that were vested at the time of the merger close should you voluntarily leave the business.

Acceptance of this offer is expressly subject to your agreement to be bound by all of the terms set forth in the previous MediaOne Group employment documents such as (1) the Employee Handbook and the Business Integrity and Ethics Handbook, and (2) all terms set forth in any prior offer letters and/or attachments given to you by MediaOne.

To confirm your acceptance, please sign this letter and return to Murri Bishop, Director-Human Resources, 188 Inverness Drive West, 8th Floor, Englewood, Colorado 80112. Please do not hesitate to contact Murri at 303-858-3858 if you have any questions.

Sincerely,
/s/
Connie Campbell
Senior Vice President, Finance

Agreed and Accepted :

/s/ Wayne M. Wolberg          7/18/00
Wayne Wolberg                 Date

Appellant's App. Vol. 1 at 95 (emphasis added).

Subsequently, Mr. Wolberg served out his one-year term, retiring from

AT&T effective April 4, 2001. He received the following separation benefits:

(1) severance pay equal to one years' salary in the amount of $180,000; (2) qualified and non-qualified pension distributions

totaling $1,386,991.87 on a lump sum basis, at Wolberg's election; and (3) the lump sum retention bonus payment of $180,000.

Id. at 78; see also Resp. Br. of Appellee, Vol. 2 at 178-87, 280.

For purposes of calculating pension benefits, the Plan defines compensation as follows:

1.13 "Compensation " means:

. . .

(1) For this purpose, "Compensation" means basic salary or wages (determined prior to any election by the Employee to reduce his salary or wages under sections 125, 132(f)(4), or 401(k) of the Code), differentials other than for geographic location or expatriate differentials, lump sums paid as merit performance awards or as a buy-out of base pay due to demotion or resulting from pay parity, non-executive bonuses, overtime and commissions.     Compensation shall exclude all other amounts, including without limitation non-cash payments, special cash payments and awards (such as hiring, retention or stay payments), executive bonuses or incentive payments , relocation allowances and other geographical area differentials, expatriate differentials, medical opt-out payments, vacation buyouts, deferred compensation and payment of any previously deferred compensation, income from the grant or exercise of Company stock options and any gross-ups of any payments. Compensation shall also exclude severance payments (including a buyout of any transition period) and payment of any compensation made after Termination, except that commissions paid within 90 days after Termination, and payments under the Company's Short Term Incentive Plan ("STIP payments") paid either:  (i) within 30 days of the Company's receipt of the Employee's executed waiver letter under the MediaOne Group Separation Plan or (ii) within 30 days after Termination if such Termination is the result of a corporate transaction such as a merger, acquisition, sale, divestiture, or swap, shall be considered Compensation and, in the case of X Participants, shall be prorated in accordance with paragraph (2) below.

Appellant's App. Vol. 1 at 96-97 (emphasis added).

Based on the plain terms of the Plan and Mr. Wolberg's written agreement designating $180,000 as a retention bonus, the Plan Administrator excluded the $180,000 bonus payment from the formula which calculated Mr. Wolberg's pension benefits based on wages and merit and non-executive bonuses.

Mr. Wolberg, through his attorney, had requested a different treatment for the $180,000, claiming it should be viewed as ordinary wages, or a merit or bonus performance award, or a non-executive bonus. The Plan Administrator denied that claim, and the decision was sustained by the Committee on appeal.[2] During this process, Mr. Wolberg was represented by counsel, submitted his own affidavit, supplemented the record, was allowed to be heard by the Committee and was provided a copy of the administrative record.

Throughout the process Mr. Wolberg has advanced the same arguments except that on appeal he also claims, as indicated above, that the district court applied the wrong standard in reviewing the Committee's decision denying his claim, and improperly considered evidence which is not in the administrative record. We address all these arguments below. We do so within the important

[2]The Committee, as referred to herein, is the Employee Benefits Fiduciary Committee. The Committee was composed of five senior level employees of AT&T Broadband from diverse geographic and business units. Appellant's App. Vol. 2 at 334.

-7-

framework that the Plan is employer-sponsored, funded, and administered. It is an employee pension plan, and a defined benefit plan, pursuant to ERISA § 3(2), 29 U.S.C. § 1002(2) and 3(35), 29 U.S.C. § 1002 (35). The Plan Administrator and members of the Committee were employees of AT&T Broadband.

## DISCUSSION

### A.

We review *de novo* the district court's grant of summary judgment. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In ERISA cases that review is confined to the administrative record. See, e.g., Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 381 (10th Cir. 1992).

Where, as is undisputed in this case, the ERISA Plan in question grants the Plan Administrator or its delegate discretion in interpreting the terms of and determining the grant of benefits under the Plan, we must uphold its decision on the issue in question unless the decision was arbitrary and capricious. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

The "pure" arbitrary and capricious standard requires us to uphold the administrator's decision if it is grounded on any reasonable basis, and that basis "need not be the only logical one nor even the best one." Nance v. Sun Life

Assur. Co. of Canada, 294 F.3d 1263, 1269 (10th Cir. 2002) (quoting Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999) (further citation omitted)).

However, for many years it has been clear that deference to the plan administrator's decision is lessened in varying degrees if there exists a conflict of interest between the administrator's duty to act in the interest of the plan participant and the administrator's self interest or loyalty to his employer. See Firestone, 489 U.S. at 115; Kimber, 196 F.3d at 1097. When there exists such a conflict of interest we undertake a "sliding scale" analysis, according deference in inverse proportion to the degree of seriousness of the conflict. Allison v. Unum Life Ins. Co. of America, 381 F.3d 1015, 1021 (10th Cir. 2004); Jones v. Kodak Med. Assistance Plan, 169 F.3d 1287, 1291 (10th Cir. 1999); McGraw v. Prudential Ins. Co. of America, 137 F.3d 1253, 1258 (10th Cir. 1998); Chambers v. Family Health Plan Corp., 100 F.3d 818, 825-26 (10th Cir. 1996).

This case presents a situation where there may be what could be termed a standard conflict of interest because the plan administrator and members of the Committee are employees and, presumably, participant/beneficiaries of their employer's self-funded plan. In such situations the burden of proof is on the plaintiff to prove the existence of the conflict, see Fought v. Unum Life Ins. Co. of America, 379 F.3d 997, 1005 (10th Cir. 2004), and to prove that any such conflict jeopardized the administrator's impartiality. See id.; Cirulis v. UNUM

Corp. , 321 F.3d 1010, 1017 n.6 (10th Cir. 2003); Kimber , 196 F.3d at 1097. In

Fought we reiterated the details of this well-established rule as follows:

> "[T]he mere fact that the plan administrator was a [company] employee is not enough *per se* to demonstrate a conflict. Rather, a court should consider various factors including whether: (1) the plan is self-funded; (2) the company funding the plan appointed and compensated the plan administrator; (3) the plan administrator's performance review or level of compensation were linked to the denial of benefits; and (4) the provision of benefits had a significant economic impact on the company administering the plan."
>
> If the plaintiff cannot establish a serious conflict of interest, we consider defendant's standard conflict of interest as one factor in determining whether defendant's denial of disability benefits to plaintiff was arbitrary and capricious. See Firestone , 489 U.S. at 115, 109 S. Ct. 948 (holding that when "a benefit plan gives discretion to an administrator . . . who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion) (internal quotations omitted); Charter Canyon Treatment Ctr. v. Pool Co. , 153 F.3d 1132, 1135 (10th Cir. 1998) (where a plan administrator is operating under a conflict of interest, "the court may weigh that conflict as a factor in determining whether the plan administrator's actions were arbitrary and capricious").

Fought , 379 F.3d at 1005 (quoting Cirulis , 321 F.3d at 1017 n.6 (internal

quotation marks omitted)).

If the plaintiff proves the existence of a conflict of interest under the

standard set out above, or proves the existence of a serious procedural

irregularity, then the burden shifts to the plan administrator to demonstrate that its

decision was reasonable within the parameters of the traditional arbitrary and

capricious standard. See id. at 1006.

Here, the district court applied a "pure" arbitrary and capricious standard of review after noting that such standard applies in the absence of a conflict of interest. Order at 4, Appellant's App. Vol. 2 at 427. Mr. Wolberg argues that the court erred by failing to recognize that a conflict of interest existed in the case and by failing to apply a less deferential standard of review using a sliding scale approach. He urges us to remand the case for re-analysis under the sliding scale and burden shifting analysis clarified by us in Fought. We are unpersuaded.

Fought did not announce any new watershed principle applicable to this case. The sliding scale approach, and the factors to be established by the plaintiff to show a conflict of interest, have been the law of this circuit for many years. See Woolsey v. Marion Labs., Inc., 934 F.2d 1452, 1459 (10th Cir. 1991); Jones, 169 F.3d at 1291; Kimber, 196 F.3d at 1097.

More to the point, Mr. Wolberg failed to establish in the administrative or district court proceedings that any conflict of interest existed which would warrant a standard of review less deferential than simply treating the existence of this employer-funded and employee-administered plan as a "standard" conflict to be treated simply as a factor in an arbitrary and capricious standard of review.[3]

---

[3]In his brief in support of his motion for summary judgment in the district court, Mr. Wolberg stated the standard of review as "the more deferential 'arbitrary or capricious' or abuse of discretion standard . . ." Br. in Support of Mot. for Summ. J. at 5, Appellant's App. Vol. 2 at 51. He mentioned conflict of

(continued...)

-11-

Mr. Wolberg's claim that the Committee was biased against him because it allowed the Plan Administrator to mention records which Mr. Wolberg had not seen is insufficient to change the standard of review, especially since the mention of the records does not achieve the prominence in the Committee's decision that Wolberg ascribes to it.

Accordingly, a standard conflict of interest must be considered only as one factor in our review. Thus, we apply the arbitrary and capricious standard to the Committee's decision, both as to the interpretation of the Plan and the denial of the requested benefit, adjusted but still according significant deference to the

---

[3](...continued)
interest as an example of abuse of discretion, id., but did not pursue the matter, stated as an undisputed fact that no remand was necessary, id. at 11, and sought no discovery. In his reply brief in support of his motion, he, for the first time, argued that the sliding scale of deference should be applied for a single reason, which he stated as follows:

> Finally, if the Committee members, all Senior level AT&TBB managers and officers, accepted the Plan Administrator's naked assertion about the allegedly reviewed "records," the Committee showed it truly operated under a conflict of interest, giving more weight and credibility to the Company's unsupported position. This conflict of interest should trigger this Court's less deferential standard of review. Chambers v. Family Health Plan Corp., 100 F.3d 818, 826 (10th Cir. 1996).

Reply Br. in Supp. of Mot. for Summ. J. at 8-9, Appellant's App. Vol. 2 at 411-12.

Committee, and requiring no shift in the burden of proof as to the reasonableness of the Committee's decision.

**B.**

Mr. Wolberg's argument, fundamentally, is that the term "retention bonus" in his agreement does not mean what it says. He contends that the language was an "incorrect label." Br. of Appellant at 27. He argues that we should "[l]ook [. . .] beyond the incorrect label placed on the $180,000" and regard it as either a "merit or performance award" or "incentive compensation" or otherwise a "non-executive bonus." Id. In his complaint Wolberg argued first that the payment simply constituted wages, id. at 9, a point (wages) to which he returns periodically but not consistently in his brief on appeal. See e.g., Reply Br. of Appellant at 3-4. As indicated, he also variously refers to the payment as one or the other of three other types of payment; but he at no point in his opening brief settles on one type of payment as being the applicable one. See, e.g., Br. of Appellant at 25-26. [4]

The problem with this position is that Mr. Wolberg agreed, in writing, to the characterization of the money in question as a retention bonus. Furthermore,

_____

[4]"The substantial evidence is that the $180,000 wage payment was either 'basic wages,' a 'lump sum payment in the nature of merit or performance award,' a 'non-executive incentive' or 'incentive compensation.'" Br. of Appellant at 26.

he did not then dispute the accuracy of that characterization, and has never identified a contrary earlier description or even alleged that the company explicitly labeled the amount as one thing in negotiating with him and then called it something else, contrary to earlier assertions, when producing a written agreement for his review and signature. To the contrary, company records produced for the administrative record, including examination by Wolberg and the Committee, do not show that the $180,000 was coded as wages for internal accounting purposes, but, rather, as a transition payment.

It is clear from the record that Mr. Wolberg is a sophisticated, highly-trained professional, astute in financial and other matters at an executive level. He has demonstrated that he pays close attention to detail. Under these circumstances it is not only appropriate to hold him to the terms of his agreement, it is well within the arbitrary and capricious standard of review to uphold the Committee's decision in this regard.

Nor are Mr. Wolberg's variations on the theme availing: (1) that the terms "retention bonus," "merit performance award," "non-executive bonus," and "incentive payment" are not defined in the Plan, are ambiguous, and that the Committee erred in denying Wolberg's claim without defining all those terms, id. at 3-4; (2) that there is no such thing as a retention payment which can be pro-rated rather than being forfeited entirely if the employee leaves short of the

-14-

expiration of the retention period; (3) that the Committee did not engage in a principled reasoning process; (4) that the Committee erroneously considered a statement by the Plan Administrator that company records showed both forfeitable and proratable retention payments, when Wolberg's counsel was not given access to such documents; and, accordingly, they do not even exist; (5) that the Committee showed bias demonstrating a conflict of interest when it failed to take into account and discuss a formal retention agreement with a forfeiture clause that the company was using (according to Wolberg) in its merger with Comcast, almost a year after the merger affecting Wolberg; and it further showed bias when it declined to look at agreements relating to six employees identified by Wolberg; and (6) that Mr. Wolberg's allegedly unopposed affidavit opining that the $180,000 retention bonus was not a retention bonus conclusively resolves the issue in his favor, especially when taken together with his testimony before the Committee that the payment in question was not initially identified by company personnel as a retention bonus (or anything else), and he was not entreated to stay on.

First, the words in question are understandable on their face. They have an ordinary, commonsense meaning—especially "retention"—which recourse to any standard dictionary would confirm. See, e.g., Hickman v. Gem Ins. Co., 299 F.3d 1208, 1212 (10th Cir. 2002) (holding that it is appropriate in ERISA cases to give

plan terms their ordinary and commonsense meaning). Accordingly, the Committee was not required to define the terms further. Furthermore, "retention" in this agreement is not rendered ambiguous by either intrinsic or extrinsic analysis. [5] Quite the opposite. The agreement itself covered a single year "to assist with the [merger] transition." For that year the agreement itself provides explicitly for three separate items of consideration: a $180,000 annual salary, a 30 percent short-term incentive, and a $180,000 retention bonus payable in a lump sum at the conclusion of the one-year temporary assignment at AT&T Broadband. The retention amount was proratable (and, therefore, reduced) if Wolberg did not stay the full year, a subject Mr. Wolberg makes much of and which we address separately. Intrinsically these separate forms of consideration are not hard to understand according to their terms. And the title going in, "Vice President Finance" hardly suggested a non-executive position.

It boils down to the simple proposition that if the $180,000 in question was wages, it would have been included in the agreement under the salary designation, converting the salary figure to $360,000 (obviously proratable over each month worked and terminating either at the end of the year or at the time Wolberg quit

---

[5]Thus, cases cited by Mr. Wolberg are easily distinguishable. See, e.g., Bynum v. CIGNA Healthcare of North Carolina, Inc., 287 F.3d 305, 314 (4th Cir. 2002) (discussing how to define what is or is not "cosmetic" in surgical procedures).

short of completing the year). If the payment was for merit or performance, then, obviously, some measurement of merit or performance would have been included; and, equally obviously, the amount could hardly be called a non-executive bonus when Wolberg's title going in was that of an executive position: vice president-finance, and there is no suggestion that the $180,000 would suddenly take on a different characterization some months into the one-year period without somehow explaining what the amount was for the first part of the period when Wolberg was clearly an executive. Finally, it is utterly inexplicable that both Wolberg and the company would agree to the term "retention bonus" in the agreement when, as he argues, the agreement was not referring to retention at all.

Extrinsically, the agreement and forms of consideration are equally unambiguous. In the merger AT&T Broadband crafted a package designed to induce a valuable executive to stay on for a year to ensure a smooth transition. Nothing ambiguous about that. Second, contrary to Mr. Wolberg's assertions, the Employee Benefits Fiduciary Committee did engage in a reasoned, principled process in considering his appeal. We set out the Committee's written decision on the point in full, as follows:

**AT&T Broadband Pension Plan
Appeal**

**Name:** Wayne Wolberg

. . .

-17-

- Mr. Wolberg claims that the $180,000 payment he received on March 23, 2001 was not a "retention" or "stay" bonus. His position is that the payment was not contingent on his remaining on the payroll of AT&T Broadband to a predetermined date. Mr. Wolberg claims that the $180,000 bonus was in the nature of a non-executive short-term bonus or merit performance award (Attachment A–Item 5) and as such, should be included in his pension calculation. He claims in his Affidavit that the $180,000 payment was treated the same as any other wage payment for purposes of taxes, FICA and 401(k) Savings Plan deductions (Attachment A–Item 13). In addition, he seeks to know if other employees have received credit in the calculation of their pension benefit for "stay" or "retention" bonuses.

. . .

*Retention Payment of $180,000*

- On March 23, 2001, Mr. Wolberg received a payment of $180,000 that was coded as a Merger Transition Payment. The Merger Transition Payment was based on a letter from Connie Campbell dated May 2, 2000 (Attachment D) that stated "the compensation package offered includes . . . and a retention bonus of $180,000 payable at the conclusion of the assignment. In the event you leave prior to March 31, 2001 the retention bonus will be prorated." The retention bonus was never characterized by AT&T Broadband as a non-executive short-term bonus or a merit performance award as referenced in Mr. Wolberg's Affidavit (Attachment A-5). The Pension Plan excludes transition and stay bonuses from eligible compensation (Attachment E). Consistent with the classification of the payment as a "transition" payment, no 401(k) deduction was taken from the payment. The payment advice dated March 23, 2001 (Attachment F-1) that included the $180,000 Merger Transition Payment had 401(k) Savings Plan deductions of $762.31. Mr. Wolberg contributed to the 401(k) Savings Plan at the maximum allowed for Highly Compensated Employees of 10%. This deduction represented 10% of his base rate of pay ($6,923.08 X 10%=$692.31 +

-18-

$70.00 adjustment on the STIP payment of $10,892.31 paid on March 15, 2001 for a total of $762.31) – it did not include a deduction of 10% of the $180,000 Merger Transition Payment as referenced in Mr. Wolberg's Affidavit (Attachment A–Item 13). The $180,000 Merger Transition Payment was correctly excluded from the calculation of Mr. Wolberg's pension benefit.

In addition, Mr. Wolberg requested that we disclose all prior determinations involving similar claims and demanded that this payment be treated consistent with prior determinations. The transition payment has been excluded from the calculations of benefits for all employees of AT&T Broadband. It has never been considered as eligible compensation for the pension plan and, based on the fact that payments of the bonus have never been transmitted to the vendor responsible for pension calculations, it has consistently been excluded from any pension calculation. Additionally, Transition Bonus payments are not eligible for deductions for the 401(k) Savings Plan. Stay payments have also been consistently excluded from the calculation of the pension benefit for all employees based on the coding as "not eligible" and the provisions of the Plan. AT&T Broadband has not previously received any claim or appeal that requested inclusion of "stay", retention", or "transition" payments in the calculation of the pension benefit, nor has any claim been received regarding the categorization of such a bonus.

In examining our records, we have confirmed that other retention bonuses were paid on both a prorated and non-prorated basis and these retention bonuses have consistently been excluded from inclusion in the calculation of the pension benefits.

. . .

-19-

**Recommendation:**

. . .

> Deny Mr. Wolberg's appeal for inclusion of the retention payment and the spot bonus in the calculation of the pension benefit based on the provisions of the pension plan that define eligible compensation. Under Section 1.13 and Section 1.18A (Attachment E), "stay" bonuses or "retention" payments are not considered eligible compensation for inclusion in the calculation of pension benefits. In addition, payments other than base rate of pay, commissions paid within 90 days of termination of employment, and STIP payments paid upon receipt of the signed waiver, are excluded from inclusion in the pension calculation. The pension benefit was calculated correctly based on the provisions of the plan and the nature of the transition payment and the spot award.

Appellant's App. Vol. 1 at 78-80.

Neither the Committee's reasoning nor its reasoning process, as shown by the foregoing, was arbitrary, unprincipled or unreasonable. To the contrary, it is eminently reasonable. Mr. Wolberg's conclusory opinion in affidavit form was clearly not the only evidence either before the Committee or the district court. The agreement, the Plan, the Company's accounting records, all the integral correspondence relating to Wolberg's claim, and other matters were before the Committee.

That leaves Mr. Wolberg with the final slender reed to which he continually returns in support of his arguments: that the lump sum retention bonus would be paid, pro rata, if he left before the one-year engagement elapsed. He contends that "pro rata" and "retention" are mutually exclusive terms, i.e., that retention

-20-

pay is only for a period certain and forfeited in its entirety if the employee leaves short of the full period. He does not cite a single case or any treatise in support of this bald proposition.

Rather, Mr. Wolberg submitted to the Committee a full-blown seven-page single-spaced legal form document which AT&T Broadband was allegedly using in connection with retention bonuses being then offered to unidentified classes of Comcast employees in connection with the merger of that company with AT&T Broadband. Id. at 212-18. He also implored the Committee to review agreements containing retention bonuses for six named employees. Appellant's App. Vol. 2 at 224.

He makes much of the fact that the Committee not only did not allude to those documents, it allowed the Plan Administrator to state that "[i]n examining our records, we have confirmed that other retention bonuses were paid on both a prorated and non-prorated basis and those retention bonuses have consistently been excluded from inclusion in the calculation of the pension benefit." Appellant's App. Vol. 1 at 79.

Both the Committee and the district court included that statement in their decisions, and did so in the face of repeated demands by Mr. Wolberg's counsel to be furnished copies of any records bearing on the issue in question—demands

to which the company did not respond, at least as regards the statement recited above.  See, e.g., id. at 209, Vol. 2 at 224.

Following the Committee's decision, which included the challenged statement to the Committee by the Plan Administrator, counsel for Mr. Wolberg demanded to see the records the administrator had examined.  The Committee responded in writing as follows:

> Dear Mr. Kennedy:
>
> This letter is in response to your letter dated May 7, 2002 that was received May 8, 2002 regarding your Notice of Intent to File Suit and Request for Undisclosed Administrative Record.
>
> The administrative record that was reviewed by the Employee Benefits Fiduciary Committee during its meetings on April 10 and April 22 is identical to the copy you and Mr. Wolberg received in advance of the meeting.  The Committee did not review any additional information including other retention agreements or stay agreements during its discussion.  The Committee based its decision on the relevant information contained in the aforementioned administrative record.
>
> Sincerely
> /s/
> Connie Adragna
> Secretary of the Employee Benefits Fiduciary Committee

Appellant's App. Vol. 2 at 281.

Leaving aside for the moment the Committee's disclaimer, Mr. Wolberg's contentions on these points might arguably support a burden shifting claim of a "serious procedural irregularity,"    see Fought, 379 F.3d at 1006.  But we think it

attempts to prove too much. The Comcast formal document, and the agreements (in an unknown form and in unknown circumstances) with six other employees do not stand for the categorical proposition Mr. Wolberg attempts to apply across the board to every and any agreement with employees at every level associated with the MediaOne-AT&T Broadband merger. Mr. Wolberg's agreement appears as virtually sui generis, and plain on its face. Internal company correspondence regarding Wolberg, and company accounting records, yield no evidence supporting his interpretation. And, finally, as the district court noted, there certainly is no legal requirement that forfeiture is an integral condition of all retention agreements. The inducement of $180,000 over and above his salary for one year is a powerful attraction, hardly vitiated by the fact that Wolberg would get only a part if he left early.

We also note that, contrary to Wolberg's assertions, the Plan Administrator's statement quoted above was not the centerpiece of either the Committee's or the district court's reasoning or decision. In fact, as noted, the Committee expressly denied any reliance on it. The conclusion that no retention payments had ever been included in the formula for calculating an employee's pension benefits was, of course, not susceptible of being produced to Wolberg's counsel, being proof of a negative; and the implied proposition that Mr.

Wolberg's counsel would send a team of accountants in to survey the records of a very large enterprise with respect to the asserted negative is untenable.

## CONCLUSION

Having considered the Committee's decision, administrative record, the district court's opinion, and Mr. Wolberg's arguments, we conclude that the Committee's decision was not arbitrary and capricious and was reasonable under any standard. Accordingly, the judgment of the district court is AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge